UNIÓN DE TRABAJADORES DE LA INDUSTRIA ELÉCTRICA Y RIEGO DE PUERTO RICO y su capítulo de Mayagüez, peticionaria, *v.* JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, demandada.

*Número:* O-69-257 *Resuelto:* 30 de diciembre de 1970

514

*Vicente Ortíz Colón,* abogado de la peticionaria; *Gilberto Gier-bolini Ortiz, Procurador General, Celia Canales de González, José E. Rodríguez Rosalí* y *Miguel A. Rivera Arroyo,* abogados de la demandada.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

El 7 de marzo de 1969 Israel Vega, un empleado de la Autoridad de las Fuentes Fluviales, en presencia de otras personas, agredió con un tubo por la espalda y los brazos al Ingeniero Humberto Alvarez, un Superintendente de la referida Autoridad. La agresión se cometió en el sitio de trabajo y en horas laborables, en Mayagüez.

Rafael Ledesma, Superintendente General de Operación y Administración de la Autoridad realizó una investigación del incidente. En el curso de dicha investigación declararon el perjudicado, el agresor y varios testigos.

Con base en dicha investigación y en sus hallazgos, Ledesma, en 11 de ese mes de marzo, le escribió una carta al empleado Israel Vega, mediante la cual le formulaba cargos, le informaba de los hechos que daban lugar a la formulación de los cargos, le notificó que a tenor con la Sec. 5 del Art. 41 del Convenio Colectivo le suspendía temporeramente de empleo y sueldo hasta tanto se ventilasen los cargos, y además le informaba que "tiene usted el derecho a solicitar de la División de Personal una vista para la ventilación de estos

cargos, lo que deberá solicitar dentro de los próximos quince (15) días laborables después de serle entregada esta notificación." Con su carta Ledesma le envió también a Israel Vega una copia de la investigación administrativa y del informe médico del doctor que examinó al perjudicado. Quedó así Vega plenamente informado y en posición de concurrir a la vista y de defenderse en ella, si así lo deseaba.

El Convenio Colectivo en cuestión es el firmado en 31 de julio de 1968 por la Unión de Trabajadores de la Industria Eléctrica y Riego de Puerto Rico (UTIER) y por la Autoridad de las Fuentes Fluviales. Dicho convenio es el que estaba vigente a la fecha de los hechos. La Sec. 5 del Art. 41 del Convenio, a base de la cual Vega fue suspendido temporeramente mientras se ventilaban los cargos, lee como sigue:

"Solamente será causa para suspensión de empleo y sueldo antes de la celebración de la vista los cargos por desfalco, hurto, escalamiento, mal uso de los fondos de la Autoridad o cuando hayan motivos razonables de que existe un peligro real de destrucción para la propiedad de la Autoridad *o la vida de cualquiera de sus empleados*." (Bastardillas nuestras.)

En 11 de marzo de 1969, el mismo día en que la Autoridad notificó a Vega de su suspensión temporera y antes de que pudiesen operar los mecanismos que provee el Convenio para estos casos de disciplina, como consecuencia de la suspensión temporera de Vega los empleados de la central termoeléctrica de la Autoridad sita en Mayagüez fueron a un paro. La Unión intervino y participó en dicho paro, respaldándolo.

Siete días más tarde, el 18 de ese mes la Autoridad de las Fuentes Fluviales presentó ante la Junta de Relaciones del Trabajo de Puerto Rico un cargo contra la Unión y su Capítulo de Mayagüez imputándole una violación del Art. 8(2) (a) de la Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 69(2) (a) y el día 21 del mismo mes la División Legal

de la Junta, a nombre de ésta, expidió una Querella contra la Unión en la cual alegó, *inter alia,* lo siguiente: (a) que la Unión querellada violó y continuaba violando el convenio colectivo al iniciar, declarar y/o respaldar un paro en la operación de la central termoeléctrica de Mayagüez sin agotar los remedios provistos en el convenio colectivo para la solución de reclamaciones y controversias, según lo dispuesto en los Arts. 39 y 45 del convenio; (b) que por dichos hechos la querellada incurrió y estaba incurriendo en prácticas ilícitas de trabajo en violación del Art. 8(2)(a) de la Ley; y (c) que debido a esos hechos solicitaba, como parte del remedio, que se condenase a la querellada a pagar a la querellante los daños causádoles como consecuencia de su actuación ilegal.

El paro de los empleados cesó cuando el patrono y la Unión acordaron someter a un árbitro el asunto de la suspensión temporera de Israel Vega. Las partes sometieron dicho asunto a arbitraje en 19 de marzo de 1969 a base del siguiente acuerdo de sumisión:

"Determinar si a la luz del Art. 41 del Convenio Colectivo vigente, la Autoridad de las Fuentes Fluviales tenía motivos razonables para considerar al empleado Israel Vega un peligro real para la destrucción de la propiedad de la Autoridad o la vida de sus empleados."

El árbitro, en su Informe, aceptó "la ocurrencia de un hecho delictivo certificado por un médico" pero falló que "la prueba de peligrosidad no la consideramos suficiente para incluir el caso presente en la excepción dispuesta por la Sección 5 del Artículo 41 del Convenio Colectivo."

Resolvió, pues, el árbitro en la negativa la cuestión planteádale en el acuerdo de sumisión. Hecho esto pasó el árbitro a hacer otras determinaciones en su Informe: Dejó sin efecto la orden de suspensión temporera de empleo y sueldo; ordenó la reposición de Israel Vega en su empleo; ordenó que se le pagase por todo el tiempo laborable que estuvo suspendido;

y ordenó que se celebrase una vista plenaria. El Informe del árbitro tiene fecha de 2 de abril de 1969.

Como dijimos antes, la Junta había expedido la querella contra la Unión en 21 de marzo. En 9 de abril de 1969 la Unión presentó su contestación a la querella, mediante la cual aceptó que es una organización obrera, que representa a empleados de la Autoridad y que para la fecha de los hechos estaba en vigor el convenio colectivo que antes hemos mencionado. Negó todo lo demás. En 4 de junio de 1969 se celebró la audiencia y las partes sometieron el caso a base de la siguiente estipulación de hechos:

"*PRIMERO:* Que el 7 de marzo de 1969, ocurrió un incidente entre el empleado Israel Vega y el Supervisor Humberto Alvarez.

*SEGUNDO:* Que como consecuencia de dicho incidente el patrono dictó una orden de suspensión de empleo y sueldo del empleado Israel Vega. La orden se incluye y se hace formar parte de esta Estipulación como Exhibit Núm. 1.

*TERCERO:* Que como consecuencia de la orden antes referida ocurrió un paro en la Central Termoeléctrica de Mayagüez. La unión tuvo conocimiento, intervino y participó en dicho paro.

*CUARTO:* El paro cesó cuando las partes acordaron someter el caso a arbitraje.

*QUINTO:* Se incluye como Exhibit Núm. 2 el Laudo del Arbitro, cuyo laudo es firme y final. Como Exhibit Núm. 3 se incluye el convenio colectivo aplicable a este caso y como Exhibit Núm. 4, la sumisión firmada por las partes, sumisión que fue sometida al árbitro."

El Oficial Examinador de la Junta, el Lic. Federico Cordero, emitió su Informe en 4 de agosto de 1969 y la Junta emitió, por unanimidad, su Decisión y Orden en 17 de octubre del mismo año. La Junta adoptó e hizo parte de su Decisión y Orden las conclusiones de hecho y de derecho del Oficial Examinador, de manera que lo dicho en ambos documentos sobre esos extremos debemos tomarlo como conclusiones de la Junta.

En síntesis, la Junta resolvió que la Unión violó el convenio al respaldar, intervenir y participar en el paro sin antes agotar los remedios dispuestos en el convenio para la solución de controversias—Art. 39, "Procedimiento Para la Resolución de Querellas." A su vez, esta violación del convenio, razonó la Junta, constituyó una práctica ilícita, a tenor con los propios términos de la Ley de Relaciones del Trabajo, Art. 8(2)(a); 29 L.P.R.A. sec. 69(2)(a).

En consecuencia, la Junta ordenó a la UTIER a (a) cesar y desistir de violar el convenio colectivo suscrito con la Autoridad de las Fuentes Fluviales; (b) compensar a la Autoridad por las pérdidas, si algunas, ocasionadas a dicho patrono por la práctica ilícita de trabajo cometida por la Union; (c) a notificar a los miembros de la Unión de su orden; y (d) a notificar al Presidente de la Junta de las providencias tomadas por la Unión para cumplir con la orden de la Junta.

Ante nos recurre la UTIER mediante solicitud de revisión estatutaria, Art. 9(2)(b) de la Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 70(2)(b), y nos solicita que dejemos sin efecto o que modifiquemos la Decisión y Orden de la Junta. La peticionaria le imputa los siguientes cuatro errores a la Junta: (1) Que hizo caso omiso del laudo de arbitraje; (2) Que no aplicó la doctrina de recriminación bajo el Art. 8(2)(a) de la Ley; (3) Que erró al concluir que la Unión había violado el Art. 8(2)(a) de la Ley al apoyar el paro en violación del convenio; y (4) Que actuó sin jurisdicción al ordenar a la UTIER a compensar al patrono por los daños que le pudiese haber causado como consecuencia de la huelga.

■ El primer error no se cometió. Los asuntos que estuvieron bajo la consideración del árbitro y de la Junta son distintos. El patrono y la Unión, para darle fin a la huelga, acordaron someter al árbitro la cuestión de si aquél, a la luz de los hechos ocurridos, tuvo motivos razonables para creer que el empleado Israel Vega era un peligro para su

propiedad o para la vida de sus empleados, a tenor con la Sec. 5 del Art. 41 del Convenio. Eso y nada más fue lo que se le sometió al árbitro. Véase el acuerdo de sumisión que anteriormente hemos transcrito *verbatim*. El problema ante la Junta era otro: consistía en determinar si la Unión incurrió en una práctica ilícita de trabajo al irse a la huelga por mor de un caso de disciplina sin antes agotar, independientemente de los méritos de la controversia, los procedimientos que para esos casos proveía el convenio.

El fallo del árbitro no resolvió el problema planteado ante la Junta, ni obligaba a ésta. Para abundar señalaremos que la propia peticionaria acepta que "la Junta tiene facultad exclusiva para entender en prácticas ilícitas del trabajo cometidas en violación de la Ley de Relaciones del Trabajo de Puerto Rico y que dicha facultad no la afecta ningún otro medio de ajuste o prevención." Reconoce también la peticionaria que "en un procedimiento de práctica ilícita la Junta no viene obligada por un laudo rendido por un árbitro en el cual los hechos envueltos puedan constituir a la vez base para una práctica ilícita de trabajo a la luz de la Ley de Relaciones del Trabajo."

Sobre el particular la propia Ley, en su Art. 7(a), 29 L.P.R.A. sec. 68(a), dispone lo siguiente:

"La Junta tendrá facultad, según se dispone más adelante en este subcapítulo, para evitar que cualquier persona se dedique a cualesquiera de las prácticas ilícitas de trabajo que se enumeran en la sec. 69 de este título. Esta facultad será exclusiva y no la afectará ningún otro medio de ajuste o prevención."

Los asuntos sometidos a las dos entidades—la Junta y el árbitro—eran distintos y cada una de ellas llegó a su propia conclusión.

En el segundo señalamiento, como indicamos antes, se le imputa error a la Junta por no aplicar la doctrina de recriminación que en determinadas circunstancias permite aplicar

el Art. 8(2)(a) de la Ley, 29 L.P.R.A. sec. 69(2)(a). Dispone dicha disposición legal que:

"Será práctica ilícita de trabajo el que una organización obrera, actuando individualmente o concertadamente con otros:

(a) Viole los términos de un convenio colectivo, incluyendo un acuerdo en el que se comprometa a aceptar un laudo de arbitraje, esté o no dicho acuerdo incluido en los términos de un convenio colectivo; Disponiéndose, sin embargo, que la Junta podrá declarar sin lugar cualquier cargo en el cual se alegue una violación de este inciso, si el patrono que es parte en el contrato es culpable de una violación en curso del convenio o no ha cumplido con una orden de la Junta relativa a alguna práctica ilícita de trabajo, según lo dispone este subcapítulo."

■ Se basa la peticionaria en el disponiéndose de ese párrafo (a) antes citado. Pero dicho disponiéndose no opera automáticamente. No dice que la Junta declarará o que tendrá que declarar sin lugar cualquier cargo, etc., sino que dice que la Junta "podrá" así hacerlo. Eso supone que la Junta ha de pasar juicio sobre si es de justicia así hacerlo o no. Eso hizo la Junta en este caso y no creemos que debemos intervenir con esa determinación suya. Todo lo contrario; entendemos por qué la Junta decidió no aplicar tal doctrina de recriminación. Veamos en síntesis la situación al respecto.

La Junta expidió una querella contra la Unión imputándole haber incurrido en una práctica ilícita de trabajo al declarar un paro sin antes agotar los remedios provistos por el convenio para la solución de controversias. En su contestación a la querella la Unión negó esos hechos pero posteriormente, en la vista, admitió su intervención y participación en el paro. Estipulación, apartado tercero. La Unión alegó que la Autoridad violó el convenio al suspender temporeramente sin vista a Israel Vega y que por eso debía aplicarse la recriminación. Sin embargo, la Unión limitó la presentación de su caso a la Estipulación antes transcrita y a la presentación de los documentos allí mencionados. Tomó, pues,

la posición de que a base de esa evidencia el Oficial Examinador y la Junta podrían resolver su defensa.

Del Anexo I del Exhibit I surge que el perjudicado, Ing. Humberto Álvarez, describió los hechos como sigue:

"Yo llegué a la Central por la mañana y seguí directamente al Taller Mecánico, como es mi costumbre. Hablé con los empleados sobre los diferentes trabajos a hacerse en esa mañana. Poco después llegó el Sr. José Donate y nos paramos frente al portón del Taller, como a 4 ó 5 pies retirados de la puerta. Hablé con él sobre lo que había pendiente para ese día, y la forma de asignar el personal para hacer los trabajos. Serían aproximadamente las 8:30 de la mañana. Y mientras estaba allí, fue cuando recibí un fuerte golpe en la espalda al nivel de la cintura. Me viré y ví al Sr. Israel Vega que con un tubo estaba agrediéndome y trataba de darme con el tubo. Me tiró otro segundo golpe, que me dio en el brazo izquierdo, y al mismo tiempo me gritaba: 'So bandido, so canalla'. El Sr. Donate se le abalanzó encima al Sr. Vega. En ese instante pasaba el Sr. Francisco Villarrubia y aguantaron al Sr. Vega. Para mí fue una sorpresa tan grande que le pregunté: 'Vega, ¿qué es lo que le pasa?' A todo esto el Sr. Vega contestaba lo mismo: 'So bandido, so canalla.' Después que lo aguantaron se montó en su carro que lo había dejado frente a la puerta de entrada de la oficina. En el carro había otra persona. El se montó al lado derecho y la otra persona prendió el carro y se fueron."

Otro testigo, José Donate Vázquez declaró:

"Yo estaba frente al Taller Mecánico hablando con el Sr. Alvarez de asuntos de la Planta.

Quiere explicarnos qué sucedió mientras ustedes hablaban?

Nosotros estábamos hablando y así, inesperadamente, llegó el Sr. Israel Vega y atacó al Sr. Alvarez con un tubo.

¿Usted vio el tubo?

Sí. En el momento de atacarle le dijo, que yo pueda recordar, 'Usted es un bandido.' Y a la misma, lo atacó. Yo lo aguanté para que no siguiera atacándolo. Le pregunté a él después que lo habíamos aguantado, que presenció el Sr. Villarrubia, le pregunté qué le pasaba; él no me dijo nada. En el incidente se le cayeron las gafas, las cogió y se fue.

No mediaron más palabras?
Nada más."

En su Informe el Oficial Examinador expresó:

"No cabe duda de que el 11 de marzo de 1969 la A.F.F. tenía suficientes elementos de juicio para considerar que existía causa fundada para considerar el caso del Sr. Israel Vega a la luz de la Sección 5 del Artículo 41. Surge del Anexo 1 al Exhibit 1 que durante la investigación realizada por la A.F.F., y en la cual participó el presidente de la Unión querellada, varios testigos señalaron que el 7 de marzo el Sr. Israel Vega golpeó con un tubo al Ing. Humberto Alvarez en la espalda y en el brazo izquierdo. (Anexo 1 al Exhibit 2, páginas 2, 5, 9.)

. . . . . . . .

La Autoridad no suspendió a este empleado viciosamente y sin justificación alguna. Hubo la agresión con un instrumento contundente en el sitio de trabajo y en horas laborables. La Autoridad por tanto tenía razones para considerar que el empleado podía constituir un peligro para 'la vida de cualquiera de sus empleados.' "

La Junta, en el ejercicio de su facultad cuasi-judicial que le confiere la Ley, no creyó que correspondía aplicar la defensa de recriminación. Aplicarla o no era potestad de la Junta pues hemos visto que la disposición legal pertinente es potestativa y no mandatoria. A la luz de los hechos de este caso no creemos que la Junta abusó de su discreción. No se cometió el segundo error señalado.

■ El tercer señalamiento es al efecto de que la Junta erró al concluir que la Unión violó el Art. 8(2)(a) de la Ley al apoyar un paro en violación del convenio. Sostiene la Unión que el convenio no tiene una cláusula expresa de no-huelga: que el derecho a la huelga es un derecho constitucional en Puerto Rico; y que en ausencia de una cláusula de no-huelga en el convenio la Junta no podía concluir que la huelga en este caso constituyó una violación del convenio y por ende una práctica ilícita de trabajo a tenor con el Art. 8(2)(a). Las primeras dos proposiciones mencionadas

en la oración anterior son ciertas, pero la tercera es incorrecta.

 Es cierto que el convenio no contiene una cláusula de no-huelga, pero contiene disposiciones expresas sobre el procedimiento que han de observar el patrono y la Unión en caso de controversias y en casos de disciplina. Arts. 39 y 41 del Convenio. La Unión fue a la huelga sin agotar esos remedios que había pactado observar. El derecho constitucional a la huelga no protege las huelgas en violación de convenios colectivos así como el derecho constitucional a la propiedad no justifica que ésta se obtenga en violación de los contratos. El derecho constitucional a la huelga puede limitarse por las partes contratantes en los convenios colectivos así como el derecho constitucional a la propiedad puede limitarse en muchas formas por medio de los contratos. Claro, en uno y otro caso, la libertad de contratar está a su vez limitada por consideraciones de orden público.[1] Viola el convenio colectivo una Unión que se va a la huelga por razón de una controversia que está sujeta al procedimiento de quejas y agravios pactado en el convenio, aunque el convenio no contenga una cláusula expresa de no-huelga. *Local 174, Teamsters* v. *Lucas Flour Co.*, 369 U.S. 95; 49 L.R.R.M. 2717.

No fue la intención de la Convención Constituyente que incluyó en nuestra Carta de Derechos el derecho a la huelga que éste fuese tan absoluto que prohibiese su limitación mediante los convenios colectivos. En su Informe a la Convención, la Comisión de Carta de Derechos se expresó sobre el particular como sigue:

"Ciertamente no se ha pretendido reclamar y menos establecer el derecho a huelga sin límite o sin reglamentación. En primer término, el derecho constitucional aquí fijado no se extiende ni a huelgas de simpatía ni a actividades concertadas

---

[1] Pero la garantía constitucional implica que ni la una ni las otras —la propiedad y las huelgas—pueden prohibirse por ley.

de carácter ilegal *ni a actuaciones en violación de los convenios.* Es perfectamente constitucional la continuada existencia de organismos en el Departamento del Trabajo, tales como Junta de Salario Mínimo, Junta de Relaciones del Trabajo, Servicios de Conciliación y Mediación y Arbitraje, etc., y la continuada prestación de sus servicios.

Persiste el derecho del Estado para emitir órdenes de cesar y desistir de determinadas actividades huelgarias cuando de acuerdo con la evidencia compulsada por los organismos correspondientes con amplia protección al trabajador resulta evidente que la acción huelgaria contraviene el convenio o en otra forma excede las circunstancias fijadas en esta disposición. No es el propósito de esta disposición fomentar huelgas o disensiones en las relaciones obrero-patronales. Antes por el contrario, el propósito es facilitar esas relaciones dentro de un clima de respeto mutuo y reconocimiento recíproco de su esencial interdependencia productiva. Para ello se provee al trabajador de medios de organización de gran importancia en el planteamiento y la validación de sus reclamaciones. Pero el Estado no se retira del campo de relaciones obreras para dejar que el trabajo y el capital se las arreglen como mejor puedan en sus posibles conflictos sin fiscalizaciones o sin arbitraje. En la teoría democrática el conflicto obrero-patronal no es un desideratum. El desideratum es la armonía, la cooperación, la más abundante producción como resultado de la justicia social. Dentro de los principios de la convivencia democrática el conflicto obrero-patronal, cuando surge, es un problema social que a todos: obreros, patronos y público perjudica, y que a todos: obreros, patronos y público urge resolver. La huelga es un medio costoso e ingrato de resolver conflictos. Una sociedad bien organizada y saludable socialmente aspira a que el recurrir a ella sea cada vez menos y menos necesario. La comisión ha juzgado propio salvaguardar el derecho a la huelga en forma explícita como supremo recurso final en la reclamación del derecho obrero." (Bastardillas nuestras.)—*Diario de Sesiones de la Convención Constituyente de Puerto Rico,* Ed. Equity de 1961, Tomo 4, pág. 2575.

No se cometió el tercer error señalado.

Mediante el cuarto y último señalamiento de error sostiene la peticionaria que incidió la Junta al ordenar a la

Unión que compensara a la Autoridad de las Fuentes Fluviales por las pérdidas que hubiese sufrido ésta como consecuencia del paro. Sostiene la peticionaria que la Junta no tiene facultad en ley para ordenar compensaciones por daños.

Es cierto que la ley no contiene en palabras expresas ese concepto de reparación de daños. Sin embargo, veamos cuál es la situación.

La Junta tiene el deber de efectuar, o de contribuir a efectuar, los propósitos de la Ley de Relaciones del Trabajo. Estos propósitos están expresados en el Art. 1 de dicha ley, 29 L.P.R.A. sec. 62, y comprenden, entre otros, los siguientes: desarrollar la producción del país hasta el máximo; distribuir esa producción tan equitativamente como sea posible; desarrollar la práctica de la negociación colectiva obrero-patronal; lograr la paz industrial, salarios adecuados y la producción ininterrumpida de artículos y servicios; la fijación de los términos y condiciones de empleo a través de la negociación colectiva; eliminar en lo posible las disputas obreras fomentando la negociación colectiva y estableciendo un tribunal adecuado (la Junta de Relaciones del Trabajo) que implemente esta política pública; se declara que los convenios colectivos están revestidos de interés público.

La ley le confiere poderes expresos a la Junta en los Arts. 7, 8 y 9 de la misma. Véase 29 L.P.R.A. sec. 68(a); sec. 69(1)(f); sec. 69(2)(a) y sec. 70(1)(b). Además la ley dispone para unas sanciones adicionales en su Art. 11, 29 L.P.R.A. sec. 72. Consideramos determinante para los efectos de lo que tenemos que resolver que cuando la ley relaciona los remedios que la Junta puede conceder u ordenar en el curso de sus funciones, el propio estatuto expresa que dicha relación no es taxativa. La ley faculta a la Junta para expedir órdenes a personas, patronos y a organizaciones obreras requiriéndoles que cesen y desistan de prácticas ilícitas de trabajo y que tomen tal acción (ordenada por la Junta) que permita efectuar los propósitos de la ley. Al así

hacerlo el estatuto menciona algunos de esos remedios, tales como la reposición de empleados, abono de paga suspendida, etc., pero a la vez aclara que la Junta podrá ordenarlos "incluyendo pero no limitándose a" ellos. A renglón seguido la ley añade que la Junta podrá expedir "cualquier otra orden contra tal persona, patrono, parte u organización obrera que permita efectuar los propósitos de la ley." Art. 9 de la Ley, 29 L.P.R.A. sec. 70(1)(b). La norma o límite legislativo que la Asamblea Legislativa impuso a la Junta sobre este particular es que el remedio ordenado vaya dirigido a efectuar los propósitos de la ley. Desde luego, esa amplia discreción que la ley le concede a la Junta para crear el remedio no es ilimitada; se ha dicho que el remedio debe ser apropiado o adecuado. *N.L.R.B.* v. *Link Belt Co.*, 311 U.S. 584, 600 (1941); *N.L.R.B.* v. *Bradford Dyeing Ass'n*, 310 U.S. 318 (1940); Goldstein, *"Effectuating Policies of the National Labor Relations Act,"* 20 B.U.L. Rev. 74 (1940).

En el caso de autos expresa la Junta que la facultad que reclama de poder ordenar, como parte del remedio, que la parte que cause daños a otra como consecuencia de una huelga ilegal le compense dichos daños, es el único remedio adecuado para bregar con el problema de las huelgas ilegales. "De hecho," nos dice, "la experiencia nos ha demostrado que es el único remedio que puede efectuar la política pública" de la ley. Y añade: "Nuestra convicción es en el sentido de que la insuficiencia del remedio limitado a la orden de cese y desista, alienta las violaciones." Como ejemplo de ello, nos informa que durante el año 1968–69 la UTIER declaró cuatro paralizaciones del trabajo en la Autoridad de las Fuentes Fluviales.

En abono de lo anterior puede señalarse que un ex-presidente de la Junta al escribir sobre los remedios que ese organismo ha estado utilizando para evitar las prácticas ilícitas de trabajo, ha expresado que los mismos son leves y que duda que sean adecuados. Añade dicho autor que cuando la

Junta comenzó a funcionar adoptó el formato de las órdenes de la Junta federal de relaciones del trabajo sin cuestionar su eficacia pero cree que la Junta no ha utilizado todos sus poderes y que esta situación "debe examinarse con miras a producir órdenes y remedios más efectivos." (²)

Tanto la Junta como el citado autor reconocen que la acción de la Junta no es ni sería punitiva sino reparadora. Ese es el tenor casi universal de la jurisprudencia sobre este punto pero realmente el uso de dichos términos con frecuencia sólo constituye un ejercicio de semática que muy poco ayuda a resolver estos problemas. Generalmente la parte que viene obligada a hacer el pago califica la orden de punitiva pero el beneficiario la califica de reparadora. Lo cierto es que quien compensa por un daño que ha causado no está sufriendo una penalidad sino que está haciendo una reparación. Por ejemplo, en *Rivera* v. *Junta*, 70 D.P.R. 5, 13 (1949), señalábamos que el allí peticionario se quejaba de que la Junta lo obligó a pagar "indemnización" a ciertos empleados. Haciéndonos eco de la jurisprudencia sobre este aspecto allí expresamos que "Nuestra ley es reparadora, no punitiva" e inmediatamente añadimos: "Por consiguiente el peticionario tiene derecho, como alega, a deducir del importe adeudado a sus empleados cualesquiera sumas devengadas de otros patronos para quienes trabajaron durante el período que no trabajaron para el peticionario, con motivo de las prácticas ilícitas del trabajo por parte del patrono." Igualmente puede decirse sobre el problema planteado en el caso de autos: el remedio ordenado por la Junta no podría comprender el pago de daños que no se sufrieron o que en alguna otra forma han sido compensados.

La realidad es que no estamos bregando con un problema de derecho privado. Sabido es que la Junta no

---

(²) Barela, *The Puerto Rico Labor Relations Act: A State Labor Policy and its Application*, 1965, pág. 160.

administra derecho privado sino derecho público. Sus funciones son estrictamente las de realizar los propósitos públicos de la Ley de Relaciones del Trabajo y sus órdenes van dirigidas a vindicar el interés público y no intereses privados. *Virginia Electric Co.* v. *N.L.R.B.*, 319 U.S. 533, 543 (1943); *Phelps Dodge Corp.* v. *N.L.R.B.*, 313 U.S. 177, 194 (1940). Esa razón—atender el aspecto de orden público de las relaciones obrero-patronales—es una por las cuales existe la Junta. (³) Sería erróneo caracterizar como punitivo un remedio u orden de la Junta que sea adecuado o apropiado para realizar los propósitos de la ley que la Junta administra. *Virginia Electric Co.*, supra, p. 543.

Ante la situación que la Junta trata de conjurar, la misma nos dice:

"No cabe duda que la insuficiencia del remedio alienta las violaciones y no efectúa los propósitos de la Ley. No puede sostenerse que la Junta está adjudicando derechos privados, pues nuestra orden sólo busca la reivindicación de la política pública, no de los derechos privados de las partes.

Aun en la jurisdicción federal, donde . . . puede argumentarse que el historial legislativo indica se limitó la facultad remedial de la Junta para ordenar pagos de pérdidas económicas, se están haciendo esfuerzos por atemperar los remedios ordenados a la situación específica de cada caso para efectuar así la política pública. En el caso de violaciones a las secciones que prohiben los 'boycotts' secundarios, y a pesar de que la ley federal provee una causa de acción en daños en las cortes federales (sec. 303), la Junta Nacional ordena la restitución de las pérdidas económicas." *Bricklayers, Local 2*, 166 N.L.R.B. No. 26, 65 LRRM 1433; McCullock, *"New Remedies Under Taft Hartley Act,"* 68 LRR 60.

La práctica administrativa de la Junta de Relaciones del Trabajo durante los últimos años ha sido la de entender que tiene facultad en ley para ordenar reparaciones económicas

---

(³) La pericia (*expertise*) del organismo es otra. Véase Davis, *Administrative Law Treatise* (1958), Vol. 1, sec. 1.05.

por creer que ése es el remedio más adecuado para efectuar la política pública de mantener la paz industrial y desalentar la práctica ilícita de trabajo que consiste en violaciones de convenios colectivos. *UTAMA y AMA*, 2-386 (1965); *Unión de Trabajadores de la Industria del Cristal*, CA-3063, D-387 (1965); *Unión Local de la Finca Victoria*, CA-3222, D-420 (1966); *Unión de Trabajadores de Cemento Mezclado*, CA-3198, D-396 (1965); *Unidad General de Trabajadores de Puerto Rico (UGT) afiliada a Seafarers International Union*, CA-3236, D-447 (1966); *UTAMA*, CA-3230, D-407 (1965); *International Longshoremen's Association, Local 1575*, D-545 (1969).

También este Tribunal ha aprobado remedios dictados por la Junta que contienen sanciones económicas. Así por ejemplo, en *J.R.T.* v. *Autoridad Metropolitana de Autobuses*, 91 D.P.R. 500, 517 (1964), ordenamos al patrono a entregar a la unión el importe de ciertas cuotas descontadas de los salarios a los obreros para beneficio de la unión, como un remedio incidental a un procedimiento de práctica ilícita. Allí dijimos:

"Consideradas todas las circunstancias del presente caso, resolvemos que la orden de la Junta sobre la disposición de las cuotas descontadas es apropiada como un remedio incidental a un procedimiento de práctica ilícita. Tal vez constituye la única forma de reivindicar el interés público envuelto en la controversia."

También hemos sostenido una decisión de la Junta ordenando al patrono a compensar a un empleado las pérdidas de sus ingresos sufridas durante el período de despido, *más intereses legales sobre dichos ingresos. J.R.T.* v. *Milares Realty*, 90 D.P.R. 844, 860 (1964). Allí expresamos que "La Junta tiene facultad para hacer tal pronunciamiento al ordenar acción afirmativa y ello puede ser uno de los medios de hacer cumplir la política pública de la Ley."

En *Virginia Electric Co.* v. *N.L.R.B.*, 319 U.S. 533, 543 (1943), se trataba de una orden de la Junta a un patrono para reembolsar unas cantidades que había deducido del salario de unos empleados y pagadas a una unión. El tribunal admitió que la orden de reembolso de fondos *se parecía* a una orden de compensación por daños particulares pero insistió en que no se trataba de un remedio para curar un perjuicio privado sino que la orden de la Junta vindicaba el interés público.

Los casos del Tribunal Supremo de los Estados Unidos posteriores al año 1947 no resuelven el problema porque éste fue resuelto en la jurisdicción federal mediante legislación del Congreso en dicho año. Como parte de las enmiendas a la National Labor Relations Act que se hicieron en 1947 se proveyó para acciones judiciales contra las uniones por daños provenientes de violaciones de convenio. Sec. 301 de la Labor Management Relations Act, 1947 (Taft-Hartley); 29 U.S.C. § 185.([4]) Pero un caso que ilumina considerablemente el aspecto que aquí estudiamos es el de *International Brotherhood etc.* v. *National Labor Relations Board*, 320 F.2d 757 (1963). En ese caso se sostuvo la validez de una orden de la Junta federal que ordenaba el pago de intereses sobre salarios debidos y no pagados, a pesar de que la Junta por aproximadamente 25 años no había ordenado el pago de intereses en casos de esa naturaleza. Allí el Tribunal de Apelaciones del Distrito de Columbia, por voz del Juez Warren E. Burger, hoy Juez Presidente de los Estados Unidos, se expresó como sigue, a las págs. 760–761:

"Aquí el problema es . . . si la ausencia de una disposición expresa en la ley imposibilita a la Junta para ordenar el pago de esos intereses como parte del remedio que la Junta *crea* . . . . La compañía (peticionaria) argumenta que la Junta carece de facultad para conceder dichos intereses. Rechazamos

---

([4]) *Cf. United Construction Workers* v. *Laburnum Corp.*, 347 U.S. 656 (1954); *Automobile Workers* v. *Russell*, 356 U.S. 634 (1958).

esa afirmación. En primer lugar, en ausencia de evidencia en contrario no vamos a entender que al Congreso reescribir la ley en 1947 y en 1959 se propuso congelar la costumbre de la Junta de no conceder intereses sobre salarios. En segundo lugar, el hecho de que no haya una autorización expresa en el estatuto para ello no opera necesariamente como una limitación al poder de la Junta. En tercer lugar, el Congreso concedió a la Junta *amplia* discreción para *crear* remedios que efectuasen los propósitos de la Ley y no podemos decir que la Junta carece de autoridad para variar su antigua costumbre." (Bastardillas nuestras.)

No hay duda de que las relaciones obrero-patronales en las postrimerías del año 1970 no se desenvuelven en las mismas circunstancias en que lo hacían hace más de 30 años cuando se aprobaron la Ley Wagner en los Estados Unidos (National Labor Relations Act de 1935) y la Ley Insular de Relaciones del Trabajo de 1938, y ni aun cuando se aprobó la vigente Ley de Relaciones del Trabajo de 1945.

Anteriormente, en ausencia de sindicatos obreros fuertes, de legislación laboral protectora de los intereses de los trabajadores y de adecuada ayuda legal, los trabajadores se encontraban virtualmente en un estado de indefensión ante la clase patronal. Era entonces posible para un patrono destruir una unión o impedir que se organizase. Esto, naturalmente, lo facultaba para prácticamente dictar los términos del contrato de trabajo. Hoy día la situación es distinta. Hay abundante legislación laboral protectora de los intereses de los trabajadores, existen fuertes uniones obreras y éstas cuentan con representación legal competente. En realidad, hoy día es casi imposible para un patrono destruir a una unión, pero es posible para una unión fuerte destruir a un patrono pequeño. Ya esas dos fuerzas frecuentemente, aunque no necesariamente, antagónicas—los obreros y el patrono— se han balanceado o casi balanceado. Naturalmente, el balance entre dichas fuerzas no es perfecto. En unas situaciones la balanza se inclina a un lado y en otras se inclina

en forma contraria. Pero ya no existe la situación de inde-
fensión antes mencionada.

Como ha dicho recientemente el Tribunal Supremo de los
Estados Unidos "el movimiento obrero ha llegado a su ma-
yoridad y debe asumir las responsabilidades ordinarias de
la vida."—*Linn* v. *United Plant Guard Workers of America*,
383 U.S. 53, 63 (1966). Más recientemente aún, en junio
de este año, el Tribunal Supremo federal, por voz del Juez
Brennan, ha señalado en forma paralela a nuestro pensa-
miento aquí expresado, la diferencia entre nuestros días y
los de hace una generación en lo que respecta a las rela-
ciones obrero-patronales. *Boys Markets* v. *Clerks Union*, 398
U.S. 235, 250–251 (1970). [5]

Es tiempo ya de que se considere en Puerto Rico la justi-
cia y la necesidad de crear un estado de derecho que permita
a la parte perjudicada por una huelga ilegal obtener ade-
cuado resarcimiento económico de la parte que injustificada-
mente causó el daño. Que una parte cause daños ilegalmente
sin que pese sobre ella la obligación de compensarlos viola
los más elementales postulados del derecho. [6] Coincidimos
con la opinión del Tribunal Supremo federal expresada en
*Phelps Dodge Corp.*, supra, en el sentido de que un estatuto

---

[5] "As labor organizations grew in strength and developed toward
maturity, congressional emphasis shifted from protection of the nascent
labor movement to the encouragement of collective bargaining and to
administrative techniques for the peaceful resolution of industrial disputes.
This shift in emphasis was accomplished, however, without extensive revi-
sion of many of the older enactments, including the anti-injunction section
of the Norris-La Guardia Act. Thus it became the task of the courts to
accommodate, to reconcile the older statutes with the more recent ones."

[6] "Los preceptos del derecho son éstos: vivir honestamente, no
causar daño a otro, y dar a cada uno lo suyo.—*Corpus Juris Civilis*,
Instituta, Tit. I, Art. 3; Pound, *Jurisprudence* (1959), Vol. III, pág. 8;
Stone, Julius, *The Province and Function of Law* (ed. 1961), 359–368;
Castán, *Derecho Civil Español, Común y Foral*, Tomo IV, 9a. ed. (1961),
págs. 836–869; Pound, *Social Control Through Law* (1942), págs. 81–83;
112–118; Maine, *Ancient Law* (ed. 1963), pág. 355. Nuestro Art. 1802
del Código Civil tiene su equivalente en prácticamente todos los derechos
del mundo.

que comprende una política pública tan amplia como la Ley de Relaciones del Trabajo necesariamente tiene que conferir a la Junta facultades amplias y presume una ingente tarea de aplicación administrativa. (7)

Como vimos anteriormente, las facultades que la Ley relaciona y delega en la Junta no están taxativamente expresadas. La seria y amplia responsabilidad que la ley de Relaciones del Trabajo deposita en la Junta y las realidades de una actividad humana tan dinámica como es la de las relaciones obrero-patronales hace casi inescapable que reconozcamos que la Junta tiene la facultad de ordenar que una parte compense a la otra los daños causádoles por una huelga ilegal, siempre y cuando que la Junta entienda que ese remedio es necesario y apropiado para efectuar los propósitos de la ley. No tenemos motivos para sustituir nuestro criterio por el del organismo creado por la ley para realizar los propósitos de la misma.

Desde luego, que en los casos en que la Junta ordene tal compensación, si las partes no estipulan los daños, la Junta deberá recibir evidencia sobre los mismos y hará las conclusiones pertinentes de hecho y de derecho.

Un último argumento de la peticionaria nos toca considerar. Ésta sostiene que la Junta carece de la facultad antes discutida porque ello puede inferirse del inciso 13 del Art. 249 del Código de Enjuiciamiento Civil (Exenciones de Hogar Seguro), 32 L.P.R.A. sec. 1130, el cual lee como sigue:

"13. Asimismo estarán exentos de embargo y de órdenes de ejecución los fondos, bienes y propiedades de las organizaciones obreras cuando las órdenes de embargo o de ejecución se expidan en acciones que surjan con motivo, como consecuen-

---

(7) Uno de los tratadistas más autorizado en derecho administrativo considera dicho caso de *Phelps Dodge* como uno normativo (*leading*) en este campo. Davis, obra citada, Vol. 4, sec. 30.10, pág. 250. Igualmente creemos que lo es el de *International Brotherhood,* supra. Para un tratamiento abarcador de todo este problema véase la extensa nota *"A Survey of Labor Remedies"* en 54 Va. L. Rev. 38 y ss. (1968).

cia de, o en relación con disputas obreras, paros o estados huelgarios; y cualesquiera embargos u órdenes de ejecución que hayan sido expedidas en tales acciones quedarán sin efecto."

■ No estamos de acuerdo. Aparte del problema de la validez de una exención ilimitada como ésa, la cual no protege meramente las herramientas, útiles, equipo, morada, o una suma determinada, sino que incluye todos los fondos y propiedades de las organizaciones obreras, (8) dicha disposición va dirigida contra reclamaciones privadas dilucidadas en los tribunales de justicia. La misma no es de aplicación cuando se trata de una orden de la Junta de Relaciones del Trabajo válidamente emitida en el ejercicio de sus funciones públicas. Un concepto consonante con éste es el contenido en el Art. 4 de la Ley Núm. 11 de 22 de mayo de 1965, 29 L.P.R.A. sec. 94, el cual dispone lo siguiente:

"A los fines de las gestiones de cobro de las multas que pudiese imponer un tribunal para castigar el desacato incurrido por la desobediencia de órdenes suyas bajo las disposiciones de este subcapítulo, no serán de aplicación las disposiciones del inciso 13 de la sec. 1130 del Título 32."

Por las razones antes dichas *la orden de la Junta dictada en este caso en 17 de octubre de 1969, se confirmará, excepto que se devolverá el caso a la Junta para que luego de oir a las partes concluya si la Autoridad de las Fuentes Fluviales sufrió pérdidas ocasionadas por la práctica ilícita de trabajo cometida por la UTIER y en caso afirmativo que determine la cuantía de las mismas.*

El Juez Presidente Señor Negrón Fernández y el Juez Asociado Señor Hernández Matos no intervinieron; el Juez Asociado Señor Pérez Pimentel emitió un voto concurrente y disidente en parte; y el Juez Asociado Señor Santana Becerra emitió un voto en parte disidente.

---

(8) *O'Leary* v. *Croghan,* 173 N.W. 844; *Skinner* v. *Holt,* 69 N.W. 595. No estamos emitiendo ahora juicio alguno sobre este problema. Nos limitamos a mencionar su posible existencia.

—o—

Voto concurrente y disidente en parte emitido por el Juez Asociado Señor Pérez Pimentel.

San Juan, Puerto Rico, a 30 de diciembre de 1970

Concurro en el resultado a que llega la opinión mayoritaria, a saber: (1) se confirma la orden de la Junta de 17 de octubre de 1969; (2) se devuelve el caso a la Junta para que determine si la Autoridad de las Fuentes Fluviales sufrió pérdidas ocasionadas por la práctica ilícita de trabajo cometida por la UTIER y (3) en caso afirmativo que determine la cuantía de las mismas.

Disiento, sin embargo, del pronunciamiento hecho en la opinión al efecto de que cuando la Junta emite una orden fijando los daños causados a un patrono por la práctica ilícita de una unión obrera, es inaplicable el inciso 13 de la Sec. 1330, Título 32 de L.P.R.A. Como se sabe, este inciso fue adicionado por enmienda de 1946, a la ley de exenciones de hogar seguro y dispone:

"13. Asimismo estarán exentos de embargo y de órdenes de ejecución los fondos, bienes y propiedades de las organizaciones obreras cuando las órdenes de embargo o de ejecución se expidan en acciones que surjan con motivo, como consecuencia de, o en relación con disputas obreras, paros o estados huelgarios; y cualesquiera embargos u órdenes de ejecución que hayan sido expedidas en tales acciones quedarán sin efecto."

Se expone en la opinión de la mayoría que esa disposición legal eximiendo de embargo y ejecución los fondos, bienes y propiedades de las uniones obreras va dirigida contra reclamaciones privadas dilucidadas en los tribunales de justicia.

En el presente caso, los daños que haya sufrido la Autoridad, deben ser considerados y son de naturaleza privada; pero aunque no lo fueran, la citada ley de exención no hace distinción alguna en cuanto al carácter de la reclamación,

siempre que ésta tenga su origen o esté relacionada con disputas obreras, paros o estados huelgarios.

Por otra parte no hay base en la ley para resolver que la exención de embargo y ejecución de los fondos y bienes de una unión obrera se aplica únicamente a las acciones judiciales seguidas contra la Unión pero que cuando es la Junta de Relaciones del Trabajo la que mediante orden condena a la Unión al pago de los daños y perjuicios sufridos por el patrono, entonces la ley de exención es inoperante y se pueden embargar y ejecutar los fondos y bienes de la Unión.

A nuestro juicio esto quiere decir que si el patrono insta ante los tribunales una acción en reclamación de daños y perjuicios provenientes de una huelga ilegal, los fondos y bienes de la unión no pueden ser embargados o ejecutados para hacer efectiva la sentencia que se dicte contra la Unión pero que si por el contrario el patrono acude ante la Junta de Relaciones del Trabajo para que ésta determine y ordene a la Unión el pago de los daños y perjuicios sufridos por el patrono entonces sí se pueden embargar y ejecutar los bienes de la Unión.

La ley que creó la Junta de Relaciones del Trabajo no le concedió a ésta facultad para librar órdenes de embargo o ejecución. Dichas órdenes necesariamente tienen que emanar de la autoridad judicial bien se recurra ante el Tribunal Supremo para que éste en el ejercicio de su poder para poner en vigor las órdenes de la Junta, decrete el embargo y ejecución de los bienes de la Unión, si es que ello procede en ley, o bien se recurra ante el Tribunal de Primera Instancia en una acción en cobro de los daños determinados por la Junta. En el supuesto de ambos casos serían los tribunales los que expedirían la orden de embargo o ejecución de los fondos o bienes de la unión obrera, los que por ley están exentos de tales órdenes cuando el origen de la reclamación es, como en este caso, un estado huelgario. Mientras la ley de exención no sea derogada o enmendada por la Legislatura, o sea decla-

rada anticonstitucional por los tribunales, los fondos, bienes y propiedades de las organizaciones obreras están exentos de embargo y de órdenes de ejecución cuando las mismas se expidan en acciones que surjan con motivo, como consecuencia de, o en relación con disputas obreras, paros o estados huelgarios.

Cuando la Legislatura quiso hacer una excepción a la amplia exención de embargo y ejecución de los bienes y propiedades de las organizaciones obreras, lo hizo expresamente como cuando aprobó la Ley Núm. 11 de 22 de mayo de 1965, citada en la opinión de la mayoría, y en virtud de la cual se hizo inaplicable la exención al cobro de determinadas multas impuestas por los tribunales como castigo por desacato.

So pretexto de su interpretación, no estamos autorizados para enmendar el estatuto de exención, ni corresponde, dentro de este procedimiento, considerar y resolver sobre su inconstitucionalidad.

—O—

Voto en parte disidente, del Juez Asociado Señor Santana Becerra

San Juan, Puerto Rico, 30 de diciembre, 1970

Como norma general, estoy enteramente de acuerdo en que la Junta de Relaciones del Trabajo de Puerto Rico tiene facultad, una vez actúa dentro de su jurisdicción, para hacer determinaciones incidentales a los poderes y facultades que expresamente le confiere la ley, o que sean una necesaria consecuencia del uso de tales poderes y facultades, aunque esas determinaciones no estén expresadas en el estatuto de su creación.

Pero, a tenor de los hechos y circunstancias de este caso específico, en ausencia de legislación que defina lo que es una huelga "ilegal"; en ausencia de norma judicial inter-

pretativa establecida y, particularmente, *en ausencia de un acuerdo en el convenio colectivo entre Unión y Patrono de no ir a la huelga,* entiendo que no existían normas de derecho lo suficientemente precisas que guiaran la acción de la Unión a los efectos de una sanción de carácter penal en el castigo que se le impone en forma de una penalidad económica.

Tratándose de una sanción por incumplimiento de un convenio colectivo, que no es otra cosa que un contrato, no interpreto como la misma obligación el acordar someter a arbitraje ciertas materias con el obligarse a no acudir a una huelga.

Mi criterio es que, en las circunstancias expresadas, en este caso específico debe eliminarse del fallo la obligación de resarcir daños.

En lo que respecta a la interpretación de las disposiciones de ley vigentes que impiden embargos contra fondos de una Unión, no expreso ahora criterio por no creerlo necesario, ya que aún no se ha llegado a una etapa de ejecución. Cuando llegue ese momento, si fuere preciso una ejecución forzosa, resolvería el punto.