EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Plan de Salud U.I.A., Inc.<br><br>    Recurrido<br><br>        v.<br><br>Autoridad de Acueductos y Alcantarillados; Unión Independiente Auténtica<br><br>    Peticionario | Certiorari<br><br>2006 TSPR 178<br><br>169 DPR \_\_\_\_ |

Número del Caso: CC-2005-1129

Fecha: 28 de noviembre de 2006

Tribunal de Apelaciones:

> Región Judicial de San Juan-Panel I

Juez Ponente:
> Hon. Carlos J. López Feliciano

Abogados de la Parte Peticionaria:

> Lcdo. Rafael Escalera Rodríguez
> Lcdo. Alberto R. López Rocafort
> Lcdo. Harry Anduve Montaño
> Lcdo. José A. Morales Boscio

Abogados de la Parte Recurrida:

> Lcdo. Jesús R. Rabell Mendez
> Lcdo. Frank Zorrilla Maldonado

Oficina del Comisionado de Seguros de Puerto Rico:

> Lcda. Yadira Rivera Cintrón
> Lcda. Diana L. Ojeda
> Lcda. Ruth Martínez González

Materia: Injuction Preliminar y Permanente

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Plan de Salud U.I.A., Inc.

    Recurrido

        v.

Autoridad de Acueductos y
Alcantarillados; Unión
Independiente Auténtica

    Peticionarios

CC-2005-1129

SENTENCIA

San Juan, Puerto Rico, a 28 de noviembre de 2006

Este caso trata de una disputa obrero patronal donde se plantea que es imperativo la abstención de los tribunales en la consideración de los méritos de la controversia suscitada entre las partes, para que sea la Junta de Relaciones del Trabajo la entidad que atienda la misma.

**I**

El 28 de septiembre de 2000 la Unión Independiente Auténtica (la "UIA" o la "Unión") y la Autoridad de Acueductos y Alcantarillados (la "Autoridad") suscribieron un convenio colectivo (el "Convenio") para regir sus relaciones obrero

patronales a partir del 1ero de julio de 1998 hasta el 30 de junio de 2003. El Art. XXV del Convenio disponía que la Autoridad habría de aportar a un plan médico o de salud para beneficio de los empleados unionados.

El plan médico contratado por la UIA fue el Plan de Salud de la UIA, Inc. (el "Plan"). El Plan es una corporación sin fines de lucro creada con el propósito de brindar servicios de cuidados de salud a los empleados de la Autoridad que fuesen miembros de la UIA, así como también a sus empleados jubilados. El Plan opera a tenor con las disposiciones de la Ley de Organizaciones de Servicios de Salud. Código de Seguros, Arts. 19.010-19.270, 26 L.P.R.A. secs. 1901-1927.

En agosto de 2004 luego de meses de negociación sobre los términos del nuevo convenio colectivo, la UIA decretó una huelga contra la Autoridad. Tras de varias semanas en huelga, las partes llegaron a unos acuerdos parciales entre los cuales se incluyó uno relacionado con el plan médico. En una estipulación de fecha de 18 de octubre de 2004 se dispuso, entre otras cosas, que los miembros de la unión seleccionarían como su plan médico entre el Plan Médico de la UIA Inc., o el Plan Médico Triple S. La Autoridad se comprometía en este "acuerdo" a que sus aportaciones al Plan comenzarían a hacerse a partir del mes de octubre de 2004. Este acuerdo sin embargo, no fue firmado por los representantes de las partes.

Posteriormente, el 28 de diciembre de 2004 la Unión y la Autoridad suscribieron y firmaron una nueva estipulación en la cual se especificó que permanecían vigentes las disposiciones referentes al plan médico consignadas en la estipulación del 18 de octubre de 2004 y lo dispuesto en el convenio colectivo suscrito en 2000 sobre el plan médico.

En junio de 2005, la Unión, la Autoridad y el Plan suscribieron un documento titulado "Documento Aclaratorio" en el cual, entre otras cosas, la Autoridad se comprometió a remitir "al Plan de Salud UIA las aportaciones correspondientes a los meses de enero a mayo de 2005." El acuerdo dispuso también que la Autoridad reanudaría sus aportaciones pendientes al Plan a partir del 1ero de junio de 2005, así como las aportaciones mensuales sujeto a varias condiciones acordadas.[1] La Autoridad no reanudó el pago de dichas aportaciones.

---

[1] El Documento Aclaratorio disponía en su sección 3 lo siguiente:

    3.    Como parte de este compromiso de la Unión Independiente Auténtica, la Autoridad de Acueductos y Alcantarillados remitirá al Plan de Salud UIA las aportaciones correspondientes a los meses de enero a mayo de 2005. La AAA reanudará las aportaciones pendientes al plan del 1 de junio del 2005 en adelante sujeto a los siguientes incisos.

        a.  El Plan someterá no más tarde del 31 de julio de 2005 la información requerida por la Oficina de Comisionada de Seguros (OCA).

        b.  Tan pronto se reciba la certificación sobre la solvencia financiera del Plan, la AAA remitirá al Plan de Salud la aportación correspondiente al mes de junio de 2005.

Así las cosas, el 3 de noviembre de 2005 el Plan presentó ante el Tribunal de Primera Instancia una demanda de sentencia declaratoria y solicitud de injunction contra la Autoridad y la UIA, reclamando los dineros adeudados por concepto de primas del plan de seguro. Se requirió de la Autoridad el pago de la cantidad de $6,426,225 y de la Unión el pago de $2,659,950, adeudado por el mismo concepto.

La Autoridad se opuso a lo solicitado por el Plan por entender que el tribunal no tenía jurisdicción para atender en la disputa y, porque el remedio solicitado era improcedente en derecho. La Autoridad arguyó que de estimarse que el convenio colectivo entre ésta y la Unión estaba vigente, la suspensión de las aportaciones del patrono al plan médico de los empleados debía calificarse como una práctica ilícita del trabajo, por lo que la jurisdicción primaria para atender en esta controversia le correspondía a la Junta de Relaciones del Trabajo del Departamento del Trabajo y Recursos Humanos.

En la alternativa, indicó que de concluirse que el convenio colectivo no estaba vigente, el tribunal carecía de jurisdicción para dictar remedio interdictal alguno toda vez que la práctica objetada constituiría una disputa obrero

---

c. De surgir un menoscabo atribuible a las razones expuestas en el inciso 2 y una vez cubierto el mismo, la AAA reanudará las aportaciones mensuales.

d. De concluir la auditoría de la OCA sin señalamiento de menoscabo, la AAA reanudará las aportaciones mensuales a partir del 1 de junio de 2005.

e.

patronal y la Ley Núm. 50 de 4 de agosto de 1947, ("Ley Núm. 50") 29 L.P.R.A. sec. 121, prohíbe la concesión de tal remedio extraordinario en disputas laborales.

El foro primario rechazó el planteamiento de la Autoridad al concluir que el caso versaba sobre el incumplimiento de una obligación contractual asumida por el patrono, la unión y el Plan en relación con los servicios de salud. Por otro lado, dispuso que no aplicaba la Ley Núm. 50 toda vez que la parte demandante en el caso, el Plan, no era ni patrono, ni empleado, ni organización obrera. En vista de tal determinación procedió a señalar la vista de injunction correspondiente.

Celebrada la vista, el tribunal emitió una resolución el 9 de noviembre de 2005 concediendo el injunction preliminar solicitado. En la misma se ordenó a la Autoridad pagar al Plan de Salud de la UIA, Inc., las aportaciones adeudadas entre junio a noviembre de 2005. La resolución dictada no le ordenó a la Unión a pagar el dinero adeudado por ésta al Plan.

Insatisfecho con la determinación del foro primario, la Autoridad presentó en esa misma fecha, un recurso de *certiorari* ante el Tribunal de Apelaciones. En el recurso presentado se plantearon, esencialmente, los mismos señalamientos esgrimidos ante el tribunal de instancia. Luego de varios trámites procesales, el Tribunal de Apelaciones dictó su sentencia el 22 de noviembre de 2005,

confirmando la determinación del Tribunal de Primera Instancia.

En desacuerdo nuevamente, la AAA presentó el correspondiente recurso de *certiorari* ante este Tribunal el cual se acompañó con una moción en auxilio de jurisdicción.[2] En el recurso presentado la Autoridad se reiteró en sus

---

[2] En el escrito presentado la Autoridad de Acueductos y Alcantarillado nos planteó la comisión de cuatro errores, a saber:

> Erró el TA al concluir que pendiente la negociación de un nuevo convenio colectivo, base de la obligación de la AAA de pagar el plan médico a los empleados unionados de la UIA, la negativa de remitir los pagos por concepto de planes médicos no es materia de la jurisdicción exclusiva de la Junta de Relaciones del Trabajo. Esto a pesar que la Ley de Relaciones del Trabajo, Ley 130 del 8 de mayo de 1945, claramente define en su sección 69 (1)(K) esta conducta como una práctica ilícita del trabajo. 29 L.P.R.A. sec. 69 (1)(K).

> Erró el TA al no reconocer que expresamente en la sección 102c de la Ley anti injucntion de Puerto Rico impide a los tribunales emitir una orden de interdicto para "pagarle, darle o retenerla a cualquier persona participante o interesada en dicha disputa, cualesquiera benéficos, seguro de huelga, u otro dinero o cosa de valor." 29 L.P.R.A. sec. 102c.

> Erró el TA al concluir que no son de aplicación los principios antes discutidos ya que el Plan UIA tiene personalidad jurídica independiente de la UIA. Para los fines de la sección 109 (B) del Título 29, Plan UIA sigue siendo una asociación "participante o interesada en una disputa obrera." 29 L.P.R.A: sec. 102(B).

> Erró el TA al concluir que es de aplicación el principio de equidad sobre los actos propios el cual solo es pertinente en ausencia de ley aplicable al caso. Véase Artículo 7 del Código Civil, 31 L.P.R.A. sec. 7.

argumentos de falta de jurisdicción sobre la materia e improcedencia del remedio dictado.

En su escrito ante nosotros el Plan de Salud U.I.A. arguyó que este caso no versaba sobre una disputa obrero patronal por lo que no aplica la Ley Núm. 50. El Plan indicó que no tenía relación de empleado con la Autoridad, ni era miembro de la unidad apropiada, sino que operaba como entidad independiente de ambas. En vista de ello la controversia planteada no podía catalogarse como una de carácter obrero patronal. Sostiene entonces que se trata, llana y sencillamente, de un asunto de incumplimiento de parte de la Autoridad con los acuerdos pactados.

La Unión por su parte esgrime, fundamentalmente, los mismos señalamientos que el Plan. Argumenta sin embargo, que de estimarse que la jurisdicción primaria le corresponde a la Junta de Relaciones del Trabajo, procede preterir el cauce administrativo habida cuenta que la Constitución del Estado Libre Asociado de Puerto Rico reconoce el derecho de los trabajadores a estar protegidos contra riesgos a su salud en su trabajo o empleo.

El 5 de diciembre de 2005, el Plan presentó una moción en auxilio de jurisdicción ante este Tribunal solicitándonos que le ordenáramos a la Autoridad a pagar la deuda en concepto de primas hasta entonces adeudada, pues de lo contrario se afectaría la solvencia del Plan. El 8 de diciembre de 2005 expedimos el auto solicitado y le ordenamos

a la Autoridad a pagar al Plan el dinero reclamado en la moción del 5 de diciembre.[3]

Posteriormente, la Oficina de la Comisionada de Seguros solicitó comparecer como amigo de la corte; solicitud, a la cual accedimos.

Poco después, el Plan nos solicitó que diéramos el caso por sometido a tenor con la Regla 50 del Reglamento del Tribunal Supremo. Tanto la Autoridad como la UIA se allanaron a la petición del Plan.

Atendido los múltiples escritos presentados por las partes y por la Comisionada de Seguros, pasamos a resolver.

## II

La controversia en este caso requiere que determinemos a quién le corresponde atender la controversia que se generó entre la Autoridad, la Unión y el Plan referente al pago de las primas del plan de salud de los empleados de la Autoridad. Por las razones que enumeramos resolvemos que la jurisdicción para atender y resolver la misma le corresponde a la Junta de Relaciones del Trabajo por lo cual el tribunal de instancia no tenía jurisdicción para dictar el injunction que le fue solicitado. Veamos.

La política pública afirmada a través de la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130 de 8 de mayo de 1945, 29 L.P.R.A. secs. 62 y sigs., promueve la paz

---

[3] En cuatro ocasiones posteriores, el Plan de Salud de la UIA, Inc., compareció ante nosotros para solicitarnos que le ordenásemos a la Autoridad de Acueductos y Alcantarillados a que le remitiera al Plan las primas del seguro médico de sus empleados que se iban acumulando. En cada ocasión accedimos a lo solicitado.

industrial por medio de la negociación colectiva. "Es la política del Gobierno eliminar las causas de ciertas disputas obreras, fomentando las prácticas y procedimientos de la negociación colectiva y estableciendo un tribunal adecuado, eficaz e imparcial que implante esta política." 29 L.P.R.A. sec. 62(4).

A tenor con tales propósitos, la Ley de Relaciones del Trabajo creó la Junta de Relaciones del Trabajo de Puerto Rico (en adelante "la Junta"), como el foro o "tribunal adecuado" para velar por el cumplimiento de las obligaciones contraídas en virtud de un convenio colectivo y evitar que cualquier persona incurra en prácticas ilícitas del trabajo. Para cumplir con tal encomienda, se le confirió **jurisdicción exclusiva** a la Junta sobre estos asuntos. Esta facultad de la Junta no puede ser afectada por ningún otro medio de ajuste o prevención, salvo circunstancias especiales. 29 L.P.R.A. sec. 68(a); *Martínez Rodríguez v. A.E.E.*, 133 D.P.R. 986, 994 (1993); *P.R.T.C. v. Unión Independiente*, 131 D.P.R. 171, 188 (1992).

De este modo, se sustrajo de los tribunales las controversias relacionadas al cumplimiento de los contratos obrero patronales. El legislador estimó que sólo un organismo especializado y diseñado exclusivamente para ese propósito, como es la Junta de Relaciones del Trabajo, podría dar plena eficacia a los derechos de organización y negociación colectiva. *P.R.T.C. v. Unión Independiente*, 131 D.P.R. 171, 188 y 190 (1992); *F.S.E. v. J.R.T.*, 111 D.P.R.

505, 513 (1981); *P.R.T.C. v. J.R.T.*, 86 D.P.R. 382, 395 (1962).

De otra parte, hemos indicado que cualquier actividad o actuación realizada por el patrono o la unión que interfiera o restrinja los derechos de los obreros a organizarse y a negociar colectivamente, se considera una práctica ilícita del trabajo sujeta a la jurisdicción exclusiva de la Junta. *F.S.E. v. J.R.T.*, 111 D.P.R. 505, 512 (1981). Así, hemos expuesto que: "nuestros legisladores --conscientes del impacto que representa el quebrantamiento de los convenios colectivos, con sus acciones concertadas concomitantes, en la incipiente economía industrial del país-- optó por definir como práctica ilícita tanto del patrono como de la unión, la violación de convenios, y delegó en la Junta Estatal la facultad de darle efectividad y vigencia a la política pública para la protección de la comunidad que encarna tal pronunciamiento." *P.R.T.C. v. J.R.T.*, *supra*, pág. 396 (1962).

Específicamente, la Ley de Relaciones del Trabajo fue enmendada para añadir como práctica ilícita del trabajo aquellas circunstancias en las que el patrono "**[s]uspenda o demuestre la intención de suspender los pagos por concepto de seguros y planes médicos de los empleados y dependientes de éstos, mientras se esté negociando un nuevo convenio colectivo o durante una huelga,** siempre que haya mediado previamente una petición escrita al patrono por parte de la unión que los representa para que aquél continúe efectuando

los referidos pagos." Ley Núm. 97 de 15 de julio de 1988, 29 L.P.R.A. sec. 69(1)(k). Véase, *A.E.E. v. J.R.T.*, 113 D.P.R. 234 (1982)(donde se resolvió que no pagar los beneficios por accidente durante el período huelgario constituyó una violación a las disposiciones del convenio colectivo).

Aún cuando el convenio colectivo, como norma general, establece la relación laboral entre un patrono y sus empleados, representados por la unión, los acuerdos que allí se plasman pueden incidir sobre variados intereses. La provisión de servicios médicos a través de un plan de salud para los miembros de un taller unionado, representa una conquista de los empleados en el proceso de negociación. Como es evidente, ello habrá de requerir que se ejecuten pagos a la aseguradora para así cumplir con el acuerdo laboral.

Ahora bien, que exista de por medio una aseguradora, como en este caso, no desvirtúa la naturaleza de la disputa obrera. A tales efectos, Ley de Relaciones del Trabajo define "disputa obrera" como:

> cualquier controversia relativa a los términos, tenencia o condiciones de empleo o en relación con la organización o representación de empleados o sobre negociación, fijación, mantenimiento, cambio o esfuerzo para convenir términos o condiciones de empleo, **estén o no los disputantes en la relación inmediata de patrono empleado**. 29 L.P.R.A. sec. 63.

Lo importante es que el asunto planteado sea uno que se refiera o esté estrechamente vinculado con los derechos que se reconocen y establecen en la Ley de Relaciones del Trabajo, independientemente de si los disputantes están "en

la relación inmediata de patrono empleado." En estos casos la jurisdicción exclusiva es de la Junta, ya que "sus funciones son estrictamente las de realizar los propósitos públicos de la Ley de Relaciones del Trabajo y sus órdenes van dirigidas a vindicar el interés público y no intereses privados." *U.T.I.E.R. v. J.R.T.*, 99 D.P.R. 512, 528 (1970). Debido a ello, cuando se trate de corregir una práctica ilícita del trabajo, de las enumeradas en nuestra legislación laboral, corresponde a la Junta la jurisdicción para dilucidar la controversia. Véase *Asociación Insular de Guardianes v. Bull Insular Line*, 78 D.P.R. 714, 719-20 (1955).

Con este trasfondo, repasemos nuevamente los hechos atinentes a esta controversia, previo a la aplicación de los mismos al Derecho expuesto.

### III

El Artículo XXV del Convenio Colectivo proveía para la aportación de las primas de un plan médico o de salud por parte de la Autoridad de Acueductos y Alcantarillados en beneficio de los empleados unionados que así lo requiriesen. Como se indicó, la Unión Independiente Auténtica contrató el Plan de Salud de la UIA, Inc. para brindarles servicios médicos a los empleados unionados de la Autoridad.

Mientras se negociaba un nuevo convenio colectivo, surgieron conflictos en cuanto a varias cláusulas del Convenio, lo que culminó en un decreto de huelga por parte de la UIA. Luego de varias semanas en huelga, el patrono y la

unión realizaron varios acuerdos o estipulaciones para poner fin a la huelga y continuar con la negociación del nuevo convenio. En la primera estipulación, de 18 de octubre de 2004, la cual no fue firmada por el Plan de la UIA, se acordó que la Autoridad aportaría, a partir de octubre de 2004, las primas de los empleados que prefirieran unirse al Plan de la UIA.[4] **Se hizo la salvedad que continuarían aplicando los artículos y las disposiciones del Convenio Colectivo referente al seguro médico que no hubiesen sido modificadas por la estipulación anterior.**

Posteriormente, las partes se reunieron y firmaron un "Documento Aclaratorio", esta vez firmado también por el presidente del Plan de la UIA, para acordar la manera y las condiciones bajo las cuales la Autoridad pagaría las primas del plan de salud, según disponía el convenio. El hecho de que el funcionario del Plan de la UIA haya firmado el referido documento, no desvirtúa la naturaleza de las negociaciones obrero patronales para proveerle a los unionados el beneficio a un plan médico acordado bajo el convenio colectivo. Los acuerdos que se hicieron con posterioridad al contrato laboral, y mientras se negociaba el nuevo convenio colectivo, deben atenderse como un todo y no como un contrato privado individual entre el Plan de la UIA y la Autoridad. Tanto la estipulación de 18 de octubre de 2004 como el Documento Aclaratorio están inexorablemente atados a las negociaciones que se llevaban a cabo sobre las relaciones

---

[4] Los acuerdos contenidos en esta estipulación fueron firmados por la UIA y la AAA el 28 de diciembre de 2004.

obrero patronales. El hecho de que dentro de las negociaciones se lleguen --de manera incidental-- a distintos acuerdos para facilitar la negociación y evitar los conflictos huelgarios, no desvirtúa su naturaleza, con el fin de conceder jurisdicción original al foro judicial.

No nos convence por lo tanto el argumento del Plan y de la Unión de que estamos frente a un caso de incumplimiento con los acuerdos convenidos y no frente a una disputa obrero patronal. Ello requeriría que obviáramos el proceso de negociación complejo que llevaba a cabo la Unión y la Autoridad previo a la firma de la estipulación. No hay duda que los derechos que se negociaron en la estipulación son parte de las obligaciones recíprocas entre patrono y empleado que se negociaron originalmente con el convenio colectivo, y que formaban parte de las negociaciones en que las partes estaban enfrascadas.

De otra parte, la Ley de Relaciones del Trabajo regula los asuntos o controversias que surgen en el contexto de la relación obrero patronal, indistintamente de que las partes involucradas que reclamen un derecho estén o no "en la relación inmediata de patrono y empleado." 29 L.P.R.A. secs. 63(6), 109(c). Lo imprescindible para determinar si una controversia constituye o no una disputa obrero patronal, no es quién plantea el asunto, sino de dónde surgen los derechos reclamados. Como hemos visto, en este caso el derecho reclamado surge del convenio colectivo y de los acuerdos

pactados por las partes mientras negociaban un nuevo convenio colectivo.

Mediante el presente pleito se pretende obligar al patrono a pagar las sumas alegadamente adeudadas por concepto de aportaciones en beneficio de los empleados acogidos al Plan de la UIA. La Ley de Relaciones del Trabajo expresamente prohíbe la conducta desplegada por el patrono -- *e.g.*, la suspensión por el patrono de los pagos correspondientes a un seguro médico para los empleados durante la huelga o la negociación de un nuevo convenio-- por lo que nos encontramos ante una actividad concertada protegida, cuya jurisdicción primaria es exclusiva de la Junta. Por tanto, los foros judiciales carecían de jurisdicción para dilucidar inicialmente si el patrono había incurrido en la práctica ilegal de cancelar los pagos correspondientes al plan médico mientras se negocia un nuevo convenio colectivo o durante una huelga.

Por otro lado, no podemos avalar la tesis de que no estamos ante una práctica ilícita del trabajo, toda vez que los empleados han tenido disponible un plan médico mientras las partes están en pugna. No hay nada en la disposiciones legales aplicables que permitan establecer una diferencia entre la suspensión de pagos de primas que conlleve la cancelación inmediata de los servicios de salud para los empleados y una situación mediante el plan médico continúa brindando los servicios, a pesar de la suspensión de los pagos por parte del patrono. Por el contrario, el texto

claro de la enmienda al Artículo 8 configura como práctica ilícita **"la intención de suspender** los pagos por concepto de seguros y planes médicos de los empleados y dependientes de éstos". 29 L.P.R.A. sec. 69(1)(k). Por consiguiente, sería contrario a los claros propósitos de la legislación obrera concluir que su aplicabilidad se circunscribe a situaciones en las cuales los empleados se queden sin los beneficios del plan.[5]

Forzoso resulta concluir que la demanda presentada ante el tribunal de instancia imputaba una práctica ilícita del trabajo, según el Artículo 8(1)(k) de la Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 69(1)(k). Correspondía, por tanto, a la Junta dilucidarlo en el ejercicio de la jurisdicción exclusiva que sobre dicha materia la ley expresamente le ha conferido.[6] Las partes estaban impedidas de preterir el cause administrativo. Cabe señalar que la Junta de Relaciones del Trabajo está facultada para, en el ejercicio de su discreción y mientras dilucida esta controversia, dictar cualquier orden que estime necesaria y

---

[5] Por otro lado, la Opinión Disidente entiende que el presente pleito es uno en cobro de dinero por los servicios prestados por el Plan de la UIA. Sin embargo, aquí el recurrido reclama que se le paguen las aportaciones patronales que surgen de un beneficio otorgado en el convenio colectivo. Además, no existen documentos que nos muevan a pensar que en realidad lo que se pretende es cobrar los servicios médicos ya prestados a los unionados suscritos al Plan de la UIA. Lo anterior demuestra patentemente que estamos ante una situación que figura dentro de los propósitos de la Ley de Relaciones del Trabajo.

[6] Siendo la Junta el organismo con jurisdicción para atender la controversia del presente pleito, resulta innecesario discutir la procedencia del *injunction* en disputas obreras, a tenor con la Ley Núm. 50 de 4 de agosto de 1947, 29 L.P.R.A. secs. 101 *et seq.*

apropiada para hacer efectiva sus prerrogativas.  Véase, 29 L.P.R.A. secs. 68-70.  Reglamento de la Junta de Relaciones del Trabajo, julio de 1979.

Se dicta sentencia revocando la sentencia dictada por el Tribunal de Apelaciones, al resolverse que la jurisdicción para atender en esta controversia le corresponde en primera instancia a la Junta de Relaciones del Trabajo.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo.  La Jueza Asociada señora Fiol Matta disidente con opinión escrita a la cual se le une el Juez Asociado señor Fuster Berlingeri.  El Juez Asociado señor Rebollo López no interviene.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Plan de Salud U.I.A., Inc.

  Demandantes-Recurridos

        v.

 Autoridad de Acueductos y
  Alcantarillados; Unión
  Independiente Auténtica

Demandados-Peticionarios

CC-2005-1129

Certiorari

Opinión disidente emitida por la Jueza Asociada señora FIOL MATTA, a la cual se une el Juez Asociado señor FUSTER BERLINGERI

En San Juan, Puerto Rico, a 28 de noviembre de 2006.

En el día de hoy, la Mayoría de este Tribunal resuelve que la jurisdicción para atender la controversia que se generó entre el Plan de Salud de la U.I.A. y la Autoridad de Acueductos y Alcantarillados le corresponde a la Junta de Relaciones del Trabajo y no a los tribunales. No podemos suscribir esa conclusión, la cual cierra las puertas de nuestros tribunales a los miembros de la Unión Independiente Auténtica que están suscritos al Plan de Salud, cuya cubierta queda amenazada por la decisión tomada por este Tribunal.

En el caso de autos, el Tribunal de Primera Instancia ordenó a la Autoridad de Acueductos y Alcantarillados, en adelante AAA, pagar al Plan de

Salud de la UIA, Inc., en adelante el Plan, ciertas aportaciones acumuladas en beneficio de los empleados de la AAA suscritos a dicho plan y cumplir con los pagos mensuales al Plan, según acordado entre las partes. El Tribunal de Apelaciones confirmó el *injunction* emitido por el foro de instancia. Ambos tribunales entendieron que la jurisdicción sobre las controversias suscitadas no le correspondía a la Junta de Relación del Trabajo.

Ante nosotros la AAA plantea nuevamente la cuestión jurisdiccional, que se deslinda a su vez en dos controversias, a saber, si la negativa de la AAA a pagar las primas adeudadas a un plan médico constituye una práctica ilícita para efectos de la jurisdicción exclusiva de la Junta de Relaciones del Trabajo, y si la controversia en torno al pago de las primas es una disputa obrera contemplada por la Ley núm. 50 sobre *Injunctions* en disputas obreras, privando así a los tribunales de justicia de su jurisdicción para conceder el remedio extraordinario solicitado. La Mayoría del Tribunal decidió en contra de nuestra jurisdicción, como resultado de una interpretación del Derecho aplicable que no comparto. Es mi criterio que al interpretar y aplicar las normas jurídicas, los tribunales debemos adoptar una visión pragmática del Derecho, más teleológica y menos propensa a aferrarse a tecnicismos y conceptos abstractos. Desde esa perspectiva, expongo a continuación una interpretación del Derecho aplicable que hubiese permitido hacer justicia en este caso.

I

La liberalidad y el carácter remedial de nuestra política pública laboral, de estirpe constitucional, se refleja en el interés del Estado en defender y proteger los derechos de los trabajadores a organizarse y negociar colectivamente. Este esfuerzo, que data desde principios del siglo XX, junto a la transformación de la economía puertorriqueña de una agraria a una industrial, llevó a nuestra Asamblea Legislativa a adoptar un esquema particularizado para resolver las consultas o disputas entre obreros y patronos. Hacia ese fin, antes de nuestra Constitución, se aprobó la Ley de Relaciones del Trabajo de Puerto Rico, Ley núm. 130 de 8 de mayo de 1945, según enmendada, 29 L.P.R.A. secs. 41 a 76.

Esta Ley procura fomentar la paz industrial mediante la negociación colectiva de los términos y condiciones de empleo y eliminar las causas de ciertas disputas obreras creando un tribunal especializado, adecuado y eficaz que implante esa política pública. Art. 1 Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 62. Para efectos de la Ley, el concepto de "disputa obrera" abarca:

> cualquier controversia relativa a los términos, tenencia o condiciones de empleo o en relación con la organización o representación de empleados o sobre negociación, fijación, mantenimiento, cambio o esfuerzo para convenir términos o condiciones de empleo, estén o no los disputantes en la relación inmediata de patrono y empleado. 29 L.P.R.A. sec. 63.

El organismo administrativo cuasi-judicial creado para poner en vigor la Ley de Relaciones del Trabajo y atender las disputas obreras es la Junta de Relaciones del Trabajo, en adelante la Junta o JRT. Art. 3 Ley de

Relaciones del Trabajo, 29 L.P.R.A. sec. 64. La Junta se concibió como una agencia especializada para administrar la política pública establecida específicamente en la Ley de Relaciones del Trabajo. Sus funciones primordiales son las de regular los procedimientos pertinentes a la representación sindical de los trabajadores, fomentar la negociación colectiva y resolver controversias relacionadas con prácticas ilícitas del trabajo, tanto de patronos como de uniones. La Ley de Relaciones del Trabajo de Puerto Rico es una traducción casi literal de la Ley Nacional de Relaciones del Trabajo, conocida popularmente como la *Ley Wagner* de 1935. 29 U.S.C. secs. 151 a 169. La diferencia esencial entre ambas leyes estriba en que la de Puerto Rico contiene prácticas ilícitas que la ley federal no contempla.

En términos generales, son prácticas ilícitas aquellas actividades o acciones realizadas por patronos o uniones que interfieren con los derechos a organizarse y de negociación colectiva de la clase trabajadora. Fondo del Seguro del Estado v. Junta de Relaciones del Trabajo, 111 D.P.R. 505, 512 (1981). Los cargos por práctica ilícita buscan prohibir que se interfiera, restrinja o coaccione a empleados en el ejercicio de su derecho a actividades concertadas, a negociar sus condiciones de empleo, a unirse o (no unirse) a una organización obrera para propósitos de negociación colectiva o con cualquier otro derecho protegido bajo el palio de la Ley de Relaciones del Trabajo. Véase, W. B. Gould, A Primer on American Labor Law, 3ra ed., MIT Press, 1993, pág. 45.

En su artículo 8, la Ley de Relaciones del Trabajo enumera las actuaciones de un patrono o una unión que

constituyen prácticas ilícitas del trabajo. Entre éstas se encuentra la violación de los términos de un convenio colectivo, ya sea por el patrono o por la unión. En la jurisdicción federal, la facultad de adjudicar una controversia de esta naturaleza pertenece a los tribunales. D. Fernández y C. Romany, <u>Derecho Laboral</u>, Editorial de la Universidad de Puerto Rico, 1987, Tomo I, pág. 39.

Hemos resuelto que el convenio colectivo es un contrato, si bien sui generis, que vincula por igual al patrono, a la unión y a los trabajadores. <u>San Juan Mercantile Corp. v. Junta de Relaciones del Trabajo</u>, 104 D.P.R. 86, 89 (1975); <u>Pérez v. Autoridad de Fuentes Fluviales</u>, 87 D.P.R. 118, 122 (1963); <u>Luce & Co. v. Junta de Relaciones del Trabajo</u>, 86 D.P.R. 425, 440 (1962). En <u>A.E.E. v. Junta de Relaciones del Trabajo</u>, 113 D.P.R. 234, 236 (1982), señalamos que, de ordinario, durante una huelga general las obligaciones contractuales entre las partes quedan en suspenso. El resultado es que durante este periodo huelgario los patronos no pagan los salarios ni beneficios no devengados acordados en el convenio. En ese caso, resolvimos que la negativa de un patrono, durante un conflicto huelgario, de satisfacer los pagos de licencias por accidentes del trabajo dispuestos por el convenio, equivalía *de facto* a una violación de los términos del convenio. Llegamos a esta conclusión al entender, en primer lugar, que los pagos de estos beneficios no dependen de que haya trabajo disponible. Además, este derecho se concedía a empleados con *status* de "regular", lo cual se determina según periodos de trabajo previamente cumplidos; los beneficios por incapacidad no

constituyen pago por servicios contemporáneos; y la huelga no es factor relevante para el cese de estos beneficios ya que su *quid pro quo* no es propiamente la realización de la labor por el empleado. <u>A.E.E. v. Junta de Relaciones del Trabajo</u>, supra, pág. 237.

No obstante lo anterior, por muchos años fue práctica generalizada y aceptada que durante un periodo huelgario o al vencimiento de un convenio y mientras duraba el proceso de negociación de un nuevo convenio, los patronos unilateralmente suspendían los pagos de ciertos beneficios, en particular los otorgados por concepto de seguros o planes médicos de los trabajadores. En respuesta a esta situación y a lo resuelto por este Tribunal en <u>A.E.E. v. Junta de Relaciones del Trabajo</u>, supra, la Asamblea Legislativa tomó la determinación de enmendar la Ley de Relaciones del Trabajo. Así, por medio de la Ley núm. 97 de 15 de julio de 1988, se estableció como práctica ilícita del trabajo el que un patrono "suspenda o demuestre la intención de suspender los pagos por concepto de seguros y planes médicos de los empleados y dependientes de éstos, mientras se esté negociando un nuevo convenio colectivo o durante una huelga...". Art. 8(1)(k) Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 69(1)(k).

De esa forma, se reconoció que es de alto interés público "proteger la salud de los trabajadores por medio de un seguro razonable que mitigue los altos costos de los servicios médicos...". Comisión de Trabajo y Asuntos de Veteranos  de la Cámara de Representantes de Puerto Rico,

Informe sobre P. de la C. 1089, 1987, pág. 2. Por eso, esta medida legislativa procuraba que el patrono mantuviese vigente un plan médico durante una huelga o un proceso de negociación de un nuevo convenio colectivo, asegurándole a los trabajadores de esa forma un acceso adecuado a servicios de salud. Además, uno de los propósitos principales de este nuevo supuesto de práctica ilícita, es evitar que el patrono utilice el derecho gremial de los trabajadores a un plan de salud como una medida de presión indebida en contra de la unión. Comisión de Trabajo del Senado de Puerto Rico, Informe sobre el P. del S. 1081, 1987, págs. 4-6. Al incluir, como práctica ilícita, la suspensión del pago del plan médico durante una huelga o una negociación de convenio, se garantizó que los trabajadores siempre tuvieran a su disposición un seguro médico suficiente para acceder a los servicios de salud que necesitaran.

La Ley de Relaciones del Trabajo dispone que la JRT tendrá la jurisdicción exclusiva para dilucidar controversias relacionadas a prácticas ilícitas del trabajo, y que dicha facultad no se verá afectada por otro medio de ajuste o prevención, salvo circunstancias especiales. Art. 7 Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 68a. Por medio de esta Ley, se sustrajo esta facultad de la jurisdicción ordinaria de los tribunales y se le otorgó a la Junta para que la ejerza en su función de garantizar y hacer efectivo los derechos de los trabajadores. Fondo del Seguro del Estado v. Junta de Relaciones del Trabajo, supra, pág. 513. De igual forma, al incluir la suspensión de un plan médico durante un conflicto huelgario o una negociación entre las prácticas

ilícitas, se otorgó a la Junta de Relaciones del Trabajo jurisdicción exclusiva para atender las controversias que se suscitaran respecto a esto.

Sin embargo, el deslinde jurisdiccional entre la Junta de Relaciones del Trabajo y el foro judicial no siempre es claro. Las controversias entre partes inmersas en una relación laboral no siempre se presentan nítidamente como disputas estrictamente laborales. Por el contrario, algunas presentan una imbricación de derechos y remedios de tal naturaleza que se requiere dilucidar de entrada el foro que debe asumir jurisdicción sobre el asunto. A esos efectos hemos distinguido entre el derecho privado y el derecho público que puede emanar de situaciones conflictivas sobre convenios colectivos o de controversias de naturaleza laboral. Asociación Insular de Guardianes v. Bull Insular Line, Inc., 78 D.P.R. 714, 720 (1955). Los derechos públicos son aquellos que emanan de la ley, que obligan e imponen ciertos deberes imperativos a la sociedad. Los individuos se obligan a éstos de forma involuntaria, ya que no requieren el consentimiento de los obligados. En cambio, los derechos privados son aquellos que se basan en el principio de la autonomía y en el consentimiento; son las obligaciones y las consecuencias legales que proceden de una acción voluntaria. Los derechos privados requieren un consentimiento a obligarse y a asumir estas transacciones voluntarias. En el campo laboral, los convenios colectivos son materia de derecho público. Aun cuando la voluntariedad y el consentimiento están presentes, la Ley impone a las partes la obligación de negociar hasta que lleguen a un acuerdo, y en cierta medida regula las materias sobre las que pueden tratar.

Véase, <u>United Steelworkers of America v. Warrior and Gula Navigation Company</u>, 363 U.S. 574, 580 (1960).

La Ley de Relaciones del Trabajo establece ciertos imperativos que obligan a las partes en una relación obrero-patronal, con el propósito de garantizar y proteger los <u>derechos públicos</u> de la clase trabajadora de Puerto Rico. Principalmente, esta Ley refleja los preceptos constitucionales que protegen el derecho de los trabajadores a organizarse y a negociar colectivamente sus términos y condiciones de empleo. Por tanto, la política pública cristalizada en esta Ley es la de promover la solución de disputas obreras para asegurar el libre ejercicio de estos derechos, que están revestidos de un claro interés público. Esta Ley impone obligaciones que no dan lugar a la discreción de las partes en una disputa obrera. El derecho público contenido en la Ley obliga sin más y requiere de mecanismos que aseguren su más fiel cumplimiento. Tomando esto en consideración, desde 1955 hemos resuelto que la Junta de Relaciones del Trabajo tiene jurisdicción exclusiva para proteger y asegurar el derecho público contenido en la Ley de Relaciones del Trabajo. Sin embargo, esto no impide necesariamente que ciertos pleitos sean atendidos por los tribunales cuando involucren intereses privados.

En <u>Asociación Insular de Guardianes v. Bull Insular Line, Inc.</u>, supra, pág. 720, resolvimos que la jurisdicción exclusiva de la Junta sobre el derecho *público* no impide que los empleados inicien en los tribunales acciones con el fin de proteger sus intereses y derechos *privados*. Por tanto, interpretamos que la Ley de Relaciones del Trabajo no sustrajo de la jurisdicción de

los tribunales la litigación sobre asuntos de interés privado de las partes en una disputa laboral. Véase, United Steelworkers of America v. Paula Shoe Co., Inc., 93 D.P.R. 661, 668 (1966). Posteriormente, en UTIER v. Junta de Relaciones del Trabajo, 99 D.P.R. 512, 528 (1970), reiteramos que "la Junta no administra derecho privado sino derecho público. Sus funciones son estrictamente las de realizar los propósitos públicos de la Ley de Relaciones del Trabajo y sus órdenes van dirigidas a vindicar el interés público y no intereses privados".

Ahora bien, el que los tribunales tengan jurisdicción en los asuntos privados dimanantes de una controversia entre partes que están inmersas en una disputa laboral no impide que la Junta resuelva aquellos asuntos que sean propiamente de interés público y que se deriven de la Ley orgánica de la JRT. No hay duda, pues, que la Junta tiene jurisdicción exclusiva en asuntos de interés público, esto es, en aquellos protegidos por las disposiciones de la Ley de Relaciones del Trabajo, como lo sería un cargo de práctica ilícita o una controversia sobre elecciones sindicales o de actividades concertadas de las uniones. No obstante, los tribunales conservamos jurisdicción para entender en los derechos o asuntos privados que se deriven en estas controversias. Lo determinante es si la naturaleza de los intereses en pugna o el remedio solicitado se relaciona directamente con los derechos protegidos por la Ley de Relaciones del Trabajo, y si la controversia que debe resolverse es esencialmente una disputa laboral. Si la controversia se refiere a derechos públicos y a condiciones y términos de empleo, la misma será una "disputa laboral" sobre la cual la Junta

tendrá jurisdicción exclusiva; si, en cambio, la controversia versa sobre intereses privados, no necesariamente será una "disputa obrera", en cuyo caso los tribunales tendrán jurisdicción para resolverla.

En aquellos asuntos en los cuales la Junta de Relaciones del Trabajo tiene jurisdicción exclusiva, su función es de carácter *cuasi-judicial*. En el ejercicio de su poder adjudicativo sobre cargos de prácticas ilícitas, la Junta tiene amplias facultades investigativas; puede expedir citaciones, tomar juramentos, examinar testigos y recibir toda la prueba que sea necesaria para atender cualquier asunto ante su consideración o en controversia. Art. 7 de la Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 68. También, dentro de su poder investigativo la Junta puede requerirle a otras agencias e instrumentalidades del gobierno que le suministren expedientes, documentos e informes relacionados con cualquier asunto ante su consideración. Id. En la vista que se celebre, la Junta puede permitir la intervención de cualquier persona o entidad que así lo solicite, a fines de recibir prueba relacionada con la controversia que debe resolver. Art. 9 Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 70.

La Ley de Relaciones del Trabajo, en su artículo 9(1)(b), también faculta a la Junta para expedir órdenes dirigidas a cualquier persona, patrono u organización obrera "requiriéndole que cese en y desista de cualquier práctica ilícita de trabajo y tome tal acción afirmativa que permita efectuar los propósitos de esta ley...". Entre otras, la Junta podrá ordenar:

> ... la reposición de empleados, abonándose o no la paga suspendida, fijando o remitiendo por correo los avisos apropiados, y poniendo fin a convenios colectivos, en todo o en parte, o cualquier otra orden contra tal persona, patrono, parte u organización obrera, que permita efectuar los propósitos de esta ley.  29 L.P.R.A. sec. 70.

Con respecto a esta facultad de emitir órdenes hemos señalado: "[l]a norma o límite legislativo que la Asamblea Legislativa impuso a la Junta sobre este particular es que el remedio ordenado *vaya dirigido a efectuar los propósitos de la ley*".  UITER v. Junta de Relaciones del Trabajo, supra, pág. 526 (énfasis suplido).  Por tanto, al igual que sucede con su jurisdicción sobre disputas obreras, la discreción que la ley le concede a la Junta para conceder remedios no es ilimitada, sino que se circunscribe a proteger derechos públicos.  No es su función garantizar ni adjudicar intereses privados.

II

En el mismo contexto de política pública de protección a la clase trabajadora, la Asamblea Legislativa aprobó la Ley núm. 50 de 4 de agosto de 1947, 29 L.P.R.A. secs. 101 a 109, mejor conocida como la Ley de *injunctions* en disputas obreras.  La Ley núm. 50 fue aprobada para limitar la jurisdicción de los tribunales para expedir órdenes de entredicho o de *injunction*, en casos que envuelvan o surjan de una disputa obrero-patronal.  Art. 1 Ley núm. 50, 29 L.P.R.A. sec. 101.  Véase, además, Junta de Relaciones del Trabajo v. Unión de Trabajadores de la Autoridad Metropolitana de Autobuses, 92 D.P.R. 367 (1965).  Debido a que se usó como modelo a su homóloga federal, a esta Ley también se le conoce como la "pequeña Norris-La Guardia".

La Ley federal Norris-La Guardia se aprobó para evitar que las acciones interdictales se utilizaran para entorpecer y restringir las acciones y actividades de los trabajadores organizados en el ejercicio de sus derechos.[7] En ausencia de expresión legislativa en el historial del proyecto que dio lugar a la Ley núm. 50, concluimos que ésta responde a una política pública igual a la que dio lugar a la Ley Norris-La Guardia, 29 U.S.C. secs. 101 a 115. Véase, El Imparcial, Inc. v. Brotherhood of Teamsters, 82 D.P.R. 164, 173 esc. 2 (1961). Se trata, por tanto, de una legislación remedial que, al igual que toda legislación laboral, debe interpretarse liberalmente para cumplir sus propósitos reparadores a favor de la clase trabajadora. Véase, Muñiz Hernández v. Policía de Puerto Rico, 134 D.P.R. 486, 495-96 (1993). El propósito de la Ley núm. 50 es el de evitar la intervención de los tribunales en perjuicio de la clase trabajadora y las organizaciones que los representan cuando éstas lleven a

---

[7] La política pública de la Ley Norris-La Guardia se encuentra contenida en su sección 2. La misma dispone:

> el trabajador individual y no unionado se encuentra usualmente desprovisto del disfrute de su derecho a la libertad de contratación e imposibilitado de proteger su libertad de trabajo, y a su vez de obtener términos y condiciones aceptables de empleo; por tanto, aun cuando es libre para no asociarse a sus compañeros, es necesario que tenga la libertad plena de asociación, organización y de elección de sus representantes, de negociar los términos y condiciones de su empleo y de estar libre de interferencia, restricciones o coacción de parte del patrono o sus agentes, en la elección de sus representantes, en el ejercicio de su derecho a organizarse o en otras actividades concertadas con el propósito de negociación colectiva, de ayuda mutua o de protección; por consiguiente, promulgamos las siguientes definiciones de y limitaciones a la jurisdicción y autoridad de los tribunales... 29 U.S.C. sec. 102.

cabo actos legítimos en el ejercicio de sus derechos durante conflictos obrero-patronales.

En el artículo 2 de la Ley se dispone expresamente que:

> [n]ingún tribunal de justicia de Puerto Rico tendrá jurisdicción para expedir orden alguna de entredicho o *injunction* preliminar o permanente en caso alguno que *envuelva o que surja de una disputa obrera* para prohibir a una persona o personas participantes o interesadas en dicha disputa, a que hagan individual o concertadamente cualesquiera de los actos siguientes... 29 L.P.R.A. sec. 102 (énfasis suplido).

La Ley procede entonces a enumerar una serie de actos que los tribunales no pueden prohibir mediante el recurso de *injunction*. Entre estos se encuentran los siguientes:

> Pagarle, darle o retenerle a cualquier persona *participante o interesada en dicha disputa obrera*, cualesquiera beneficios, seguro de huelga, u otro dinero o cosa de valor. 29 L.P.R.A. sec. 102(c) (énfasis suplido).

De esta manera, la Ley núm. 50 privó a los tribunales de jurisdicción para conceder *injunctions*, prohibiéndole a las partes en una disputa obrera el realizar individual o concertadamente *los actos descritos en la misma*, salvo los permitidos de manera restrictiva por la Ley.[8] El Imparcial v. Brotherhood of Teamsters,

---

[8] La Ley dispone que un *injunction* para prohibir los actos contenidos en el artículo 2 sólo podrá ser emitido, a pesar de existir una disputa laboral, bajo las siguientes circunstancias:

> (a) Que se ha amenazado cometer y se cometerán actos de fraude o violencia, a menos que se impidan o se han cometido y continuarán cometiéndose dichos actos a menos que se impidan pero no se expedirá ningún *injunction* ni orden de entredicho temporal con motivo de amenaza o acto alguno de fraude o violencia excepto contra la persona o personas o la asociación u organización que hiciere la amenaza o cometiere el acto de fraude o violencia o que realmente

supra, pág. 173. El historial legislativo de la Ley federal que fue modelo para la nuestra revela que la intención de esta prohibición es evitar la intromisión judicial por medio de órdenes interdictales que entorpezcan o menoscaben las actividades legítimas de los obreros. Concluimos que, al igual que su homóloga federal, la Ley núm. 50 es una ley de vanguardia que busca proteger las actividades concertadas de los obreros de toda intervención judicial que resulte en su perjuicio. Como bien estableciera el Tribunal Supremo de Estados Unidos, "[l]a Ley Norris-La Guardia (...) expresa una política pública básica en contra de interdictos de actividades de uniones laborales". <u>Machinists v. Street</u>, 367 U.S. 740, 772 (1961). Lo mismo podemos decir de la Ley anti *injunction* puertorriqueña.

Uno de los puntos neurálgicos de la Ley Núm. 50 es que restringe la intervención judicial en casos "que

_____

autorizare dicho acto después de tener conocimiento real del mismo;

(b) que habrán de resultar daños sustanciales e irreparables a la propiedad física del querellante;

(c) que en cuanto al remedio solicitado para cada alegación resultaría mayor perjuicio para el querellante negándosele el remedio que el que habría de resultar para los querellados si se concediera el remedio;

(d) que el querellante no tiene ningún otro recurso adecuado en derecho, y

(e) que los funcionarios públicos encargados del deber de proteger la propiedad del querellante no pueden o no están dispuestos a proporcionar la protección adecuada. 29 L.P.R.A. sec. 105.

Por tanto, la intervención de los tribunales en disputas obreras se permitirá sólo cuando el orden público pueda verse afectado, y no se pueda asegurar que la disputa obrera se resolverá de forma pacífica y ordenada.

envuelva[n] o surja[n] de una disputa obrera". Al igual que su contraparte federal, la Ley núm. 50 ofrece una definición abarcadora de lo que es "disputa obrera" en aras de adelantar los propósitos estatutarios de protección a las actividades concertadas. Véase, por ejemplo, <u>New Negro Alliance v. Sanitary Grocery</u>, Co., 303 U.S. 552 (1938). La Ley núm 50 define "disputa obrera" en los siguientes términos:

> (a) Se considerará que un caso envuelve o surge de una disputa obrera cuando dicho caso envuelve a personas dedicadas a la misma industria, oficio, arte manual u ocupación; o que tienen interés directo o indirecto en los mismos; o que sean empleados del mismo patrono; o miembros de la misma organización de empleados o patronos, o de alguna organización afiliada a la misma; bien sea dicha disputa:
>
>> (1) Entre uno o más patronos o asociaciones de patrono y uno o más empleados o asociaciones de empleados;
>>
>> (2) entre uno o más patronos o asociaciones de patronos y uno o más patronos o asociaciones de patronos, o
>>
>> (3) entre uno o más empleados o asociaciones de empleados y uno o más empleados o asociaciones de empleados; o cuando el caso envuelve cualesquiera intereses conflictivos o en pugna en una disputa obrera de personas participantes o interesadas en la misma.
>
> (b) Se considerará que una persona o asociación es participante o está interesada en una disputa obrera si se solicita recurso contra dicha persona o asociación, o si cualquiera de éstas se dedica a la misma industria, oficio, arte manual u ocupación en que ocurra dicha disputa, o tiene interés directo o indirecto en la misma, o es miembro, funcionario o agente de cualquier asociación compuesta total o parcialmente de patronos o empleados dedicados a tal industria, oficio, arte manual u ocupación.
>
> (c) El término disputa obrera incluye cualquier controversia relativa a término o condiciones de empleo o relativa a la asociación o representación de personas al negociar, fijar, mantener, cambiar, o tratar de llegar a un acuerdo sobre términos o

condiciones de empleo, aunque las partes se encuentren o no en la relación inmediata de patrono y empleado.[9]  29 L.P.R.A. sec. 109.

El lenguaje de esta disposición permite considerar como "disputa obrera" cualquier conflicto que envuelva de cierta manera las actividades concertadas legítimas de trabajadores o uniones obreras.  No obstante, se requiere que la disputa sea acerca de términos o condiciones de empleo, el derecho de asociación de los trabajadores o negociación colectiva, entre otras cosas.[10]  Cabe destacar que se desprende de la Ley Núm. 50 que para ser disputa obrera la controversia debe involucrar los derechos públicos protegidos por las leyes y la política laboral de Puerto Rico.  Por tanto, en aquellas situaciones que presenten una imbricación de derechos e intereses privados

---

[9]    La definición que da la Ley de Relaciones del Trabajo al concepto de "disputa obrera" es casi idéntico al de este último inciso.  Según esta Ley, "disputa obrera":

Incluye cualquier controversia relativa a los términos, tenencia o condiciones de empleo o en relación con la organización o representación de empleados o sobre negociación, fijación, mantenimiento, cambio o esfuerzo para convenir términos o condiciones de empleo, estén o no los disputantes en la relación inmediata de patrono y empleado.  Art. 2 Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 63.

[10]   Se ha entendido que las "disputas obreras" se pueden dividir en cuatro categorías:

(1) las causadas por la interpretación o incumplimiento de un convenio colectivo;


(2) las que se relacionen a los términos y condiciones de empleo;
(3) las controversias entre dos o más uniones en cuanto a su jurisdicción sobre determinadas unidades de trabajo; y
(4) las concernientes a los derechos de los obreros a organizarse y negociar colectivamente con su patrono.  E.M. Dangel y I.R. Shriber, The Law of Labor Unions, Massachussets, National Law Publishers, 1941, sec. 8.

con los derechos públicos tutelados por la Ley los tribunales tienen plena jurisdicción para resolver, respecto a los primeros, las controversias presentadas y proveer los remedios que sean necesarios, incluso el de emitir un *injunction*. De no estar en conflicto los derechos públicos protegidos por las leyes laborales, los tribunales conservarán su jurisdicción ordinaria para proteger los intereses privados en pugna. En estos casos la controversia sería de naturaleza privada y no pública, por lo cual no sería una "disputa obrera" para efectos de la Ley núm. 50. En otras palabras, siempre y cuando no se trate de "términos o condiciones de empleo o relativa a la asociación o representación de personas al negociar, fijar, mantener, cambiar, o tratar de llegar a un acuerdo sobre términos o condiciones de empleo" o implique aquellos derechos públicos protegidos por las leyes laborales o las secciones 16, 17 y 18 del artículo II de la Constitución del Estado Libre Asociado de Puerto Rico,

estaremos ante una controversia privada, sujeta a la jurisdicción de los tribunales de justicia.

### III

En sus escritos, la AAA se refiere constantemente a la imbricación entre la UIA y el Plan de Salud y arguye que ambos funcionan bajo una misma administración. Por eso, antes de aplicar el marco jurídico descrito a la controversia de autos, es necesario aclarar si el Plan de Salud UIA es, en efecto, una entidad independiente.

Veamos primeramente la relación entre el Plan y la Unión. No hay duda de que el Plan fue producto, en su origen, de una negociación colectiva entre la AAA y la

Unión. No obstante, en noviembre de 1993 el Plan se incorporó en el Departamento de Estado como una corporación de fines no pecuniarios bajo la Ley de Corporaciones de Puerto Rico. Además, en 1994, fue autorizado y certificado por la OCS para operar como una organización de servicios de salud conforme las disposiciones del Código de Seguros de Puerto Rico. Su propósito es el de brindar servicios de cuidado de salud a los empleados y ex-empleados de la AAA que sean miembros de la Unión Independiente Auténtica de la AAA.

El establecimiento de planes médicos por medio de la negociación colectiva en beneficio de empleados no es una innovación reciente. Ya desde sus inicios, durante la era de la industrialización, las uniones y sindicatos operaban planes de asistencia y beneficencia a favor de sus miembros. Sin embargo, no es hasta principios del siglo XX que los patronos comienzan a ofrecer la disponibilidad de un seguro médico como beneficio marginal a un empleo. Inicialmente, estos seguros se establecían mediante la creación de fondos o fideicomisos administrados por comités conjuntos compuestos por representantes de la unión y del patrono. En otras instancias, el patrono ofrecía un seguro médico bajo su propia administración y control, alternativa que no contaba con el apoyo de las uniones porque no les permitía participar en la administración del plan. También surgieron los planes de las uniones costeados por el patrono, pero éstos usualmente se enfrentaban a dificultades financieras al no contar con los fondos suficientes para asegurar su funcionamiento y administración. De esa forma, según fue creciendo la

industria de los seguros, se convirtió en práctica usual que en los convenios colectivos se pactara para el pago de un plan médico provisto por una compañía aseguradora, dedicada enteramente a esta industria, independiente de ambas partes y ajena a la relación obrero-patronal. En la mayoría de estos planes adquiridos por medio de negociación colectiva se requiere que los empleados sean miembros de una unión determinada para participar de los servicios de la cobertura.  Este requisito es común tanto en planes administrados por aseguradoras comerciales como en los que son administrados por una unión o por el patrono.  Véase, en general, <u>Union Contract Clauses</u>, Commerce Clearing House, Inc., 1954, págs. 387-392.

La industria del seguro en Puerto Rico está regulada por el Código de Seguros.  La empresa que interese operar como una aseguradora de servicios de salud tiene que cumplir con las disposiciones del capítulo 19 del Código de Seguros, 26 L.P.R.A. secs. 1901 a 1927, y solicitar un certificado de autoridad del Comisionado de Seguros.  Una vez autorizado a funcionar como asegurador de servicios de salud, el Código de Seguros y la Ley de Corporaciones le reconocen a estas organizaciones una personalidad jurídica especial.  En virtud de ello, una organización que funciona como plan médico tiene personalidad jurídica propia y opera de manera independiente de cualquier otra entidad. Además, como corporación certificada y autorizada a funcionar como organización de servicio de salud, un plan médico está sujeto a inspecciones regulares del Departamento de Salud y a cumplir con todas las exigencias de la Oficina de la Comisionada de Seguros.

El Plan de Salud de la UIA es una corporación sin fines de lucro certificada para operar como una organización de servicios de salud conforme al Código de Seguros de Puerto Rico. A diferencia de los planes sindicales o patronales, este seguro médico se organizó conforme lo requiere el Código de Seguros y fue certificado por la OCS para operar como una organización dedicada al negocio de seguros de salud. Este plan no funciona como un fideicomiso de fondos cuya existencia depende de las disposiciones de un convenio colectivo que establece la formación de un fondo y su administración. Tampoco depende de la subcontratación de una aseguradora comercial para ofrecer sus servicios. Por el contrario, el Plan cuenta con Artículos de Incorporación y con un Reglamento Corporativo propio para regir la administración de la corporación y de sus fondos. Además, ofrece sus servicios directamente con los proveedores médicos, sin necesidad de que una compañía comercial le sirva de intermediaria. El hecho de que el Plan ofrezca sus servicios sólo a los miembros de la UIA no es óbice para el reconocimiento pleno de su personalidad jurídica, pues la eligibilidad limitada de los beneficiarios no es contraria al mercado de los seguros.[11] Por tanto, el Plan

---

[11] Ese es el caso, por ejemplo, de las compañías aseguradoras comerciales, que ofrecen algunas cubiertas a grupos selectos de individuos. Usualmente esto se hace por medio de seguros grupales (*group insurances*), en los cuales mediante una póliza de seguro se ofrece cobertura a varios individuos. Estos seguros limitan la cobertura de sus pólizas a determinado grupo de individuos, que pueden ser empleados, industrias, comercios y asociaciones profesionales. La forma más común de los seguros grupales es el seguro médico grupal que ofrecen los patronos a sus empleados. Véase, R.E. Keeton, Basic Text on Insurance, West Publishing Co., 1971, págs. 62-66;R.E. Keeton y A.I. Widiss, Insurance Law: A Guide to Fundamental Principles, Legal Doctrines, and Commercial Practices, West Publishing

de Salud de la UIA es una aseguradora de servicios de salud para efectos del Código de Seguros y debe ser reconocido como tal.

En nuestro ordenamiento, la personalidad jurídica de una entidad implica su reconocimiento por parte del Estado como sujeto de derecho. La AAA no nos ha provisto fundamentos concretos que ameriten hacer caso omiso de la personalidad jurídica propia e independiente que el Código de Seguros y la Ley de Corporaciones le confieren al Plan. La realidad es que la AAA ha reconocido durante años la personalidad jurídica del Plan.  Hace más de diez años que paga al Plan las primas acordadas e incluso incluyó al Plan como proveedor legítimo de seguro médico en el convenio colectivo con sus empleados. Además, la AAA firmó voluntaria y conscientemente, en junio de 2005, el Documento Aclaratorio en el cual no sólo reconoce la personalidad jurídica independiente del Plan, sino que se compromete *directamente con éste* a realizar ciertos pagos, con la reserva de que el Plan, a su vez, cumpla ciertas condiciones.  También pactó expresamente que los pagos se harían directamente al Plan, no a través de la Unión.

Tampoco podemos ignorar que la AAA acordó directamente con el Plan ciertos asuntos relacionados a su administración.  Según estos acuerdos, que están contenidos en un anejo a la estipulación de diciembre de 2004, la AAA tendría representación en la Junta de Directores del Plan, y dicha junta sería dirigida por una persona que no estuviese relacionada ni con la Unión ni

---

Co., 1988, págs. 103-106; <u>Couch on Insurance</u> 3d, Thomson/West, 2005, secs. 8:1-8:76.

con la AAA.[12] Esa persona resultó ser Monseñor Roberto González, Arzobispo de San Juan. De esa forma, la propia AAA, es decir, el patrono, tiene representación en la Junta de Directores, y quien preside dicha junta es un tercero nombrado por acuerdo entre las partes.

Lo anterior nos lleva a concluir que el Plan de Salud de la UIA es una organización que funciona separada e independientemente de la UIA y de la AAA,[13] aun cuando los servicios que preste sean exclusivamente para empleados de este patrono y miembros de esa unión. No hay nada en los autos ante nuestra consideración que lleve a concluir que el Plan y la UIA son o funcionan como una misma entidad. Las alegaciones sin prueba de la AAA no son suficientes para descartar la personalidad jurídica independiente del Plan de Salud.

Otro fundamento importante formulado por la AAA para sustentar su alegación de falta de jurisdicción es que su relación con el Plan es de naturaleza laboral.

---

[12]   En la estipulación se dispuso lo siguiente en torno al plan médico:

> Las partes aquí comparecientes acuerdan que con relación al Plan Médico UIA, Inc. se constituirá una Junta de Directores Interina de dos (2) representantes nombrados por la UIA; dos (2) representantes nombrados por la AAA y un quinto miembro, quien presidirá la Junta. Este quinto miembro, según acordado por las partes, será el Monseñor Roberto González.

[13]   Otra prueba de la independencia institucional entre la UIA y el Plan, es la demanda de injunction y en cobro de dinero que ha incoado la administración del Plan contra la Unión. Además, los planteamientos de la Unión en su moción sobre la intervención de la OCS reflejan el funcionamiento autónomo de ambas entidades. En esa moción del 16 de febrero de 2006, la Unión expresó su insatisfacción con las actuaciones del Plan y la invitación que la administración de éste extendiera a la OCS para fiscalizar sus operaciones. Las críticas formuladas por la UIA manifiesta claramente que el Plan no es alter ego de la Unión, como ha argüido la AAA.

Aduce respecto a esto que el Plan, y las obligaciones de la AAA para con éste, provienen del convenio que es producto de la negociación colectiva entre la AAA y la UIA.

Ciertamente, el derecho de los empleados de la AAA a un seguro médico nace del convenio colectivo negociado entre la Unión y el patrono. Además, en la "Estipulación" firmada por la UIA y la AAA, éstos acordaron que los unionados podían elegir entre "el Plan Médico de la UIA, Inc. o el Plan Médico Triple S".[14] Se trata de acuerdos que sólo contemplan asuntos de naturaleza obrero-patronal entre la UIA y la AAA; ni el Plan ni la Triple S participaron en las negociaciones que produjeron estos acuerdos ni firmaron los mismos. Evidentemente, el que se haya incluido al Plan y a Triple S en estos acuerdos como opciones de seguro médico no puede implicar que la relación establecida entre el Plan y la AAA, o entre Triple S y la AAA, tenga carácter obrero-patronal.

El Documento Aclaratorio en el cual la AAA se compromete a pagar las aportaciones adeudadas al Plan y a reanudar el pago de aportaciones sujeto a la auditoria de la OCS, fue suscrito por la Unión, la AAA y el Plan.[15] La

---

[14]     La estipulación lee en lo pertinente:
*Los unionados seleccionarán libremente el Plan Médico de la UIA Inc. o el Plan Médico Triple S.* Ninguna de las partes hará campaña para la selección del Plan Médico. La aportación de primas de la AAA al Plan Médico UIA, Inc. para los empleados que prefieran dicho Plan, comenzará a partir del mes de octubre del 2004. (énfasis suplido).

[15]     En el "Documento Aclaratorio" de junio de 2005, las partes suscribientes acordaron:
1. A tenor con la certificación emitida por la Comisionada de Seguros el 23 de junio de 2005, ésta certifica que *las primas del Plan de Salud UIA, Inc. [PSUIA, Inc.] correspondientes a los meses de agosto a diciembre de 2004 son*

AAA alega que este documento, en el cual cada firmante asumió ciertas obligaciones respecto a los otros, es

_____

*una deuda de la UIA*, según Resolución Corporativa firmada por la Junta de Directores de la UIA.  La Unión Independiente Auténtica, por la presente, se compromete a asumir el pago de las aportaciones del PSUIA, Inc. correspondiente a los meses de agosto a diciembre de 2004.  Lo anterior no podrá interpretarse como una modificación a los términos contenidos en la estipulación firmada entre la AAA y la UIA del 28(29) de diciembre de 2004.

        . . . .

*De igual forma, la Unión Independiente Auténtica se compromete a asumir cualquier menoscabo al PSUIA, Inc. correspondiente a los meses de enero al 30 de junio de 2005, atribuible a apropiación ilegal, malversación, mal uso de fondos o negligencia del Administrador del Plan*, y que surja como resultado de la auditoría que la Oficina del Comisionado de Seguros (OCS) realizará a partir de agosto de 2005. De surgir un menoscabo no atribuible a las razones anteriores, se procederá de conformidad a lo estipulado en el convenio colectivo.

        . . . .

3. Como parte de este compromiso de la Unión Independiente Auténtica, *la Autoridad de Acueductos y Alcantarillados remitirá al Plan de Salud UIA* las aportaciones correspondientes a los meses de enero a mayo de 2005.  La AAA reanudará las aportaciones pendientes al plan del 1 de junio del 2005 en adelante sujeto a los siguientes incisos.

  a. El Plan someterá no más tarde del 31 de julio de 2005 la información requerida por la Oficina de Comisionada de Seguros (OCS).

  b. *Tan pronto se reciba la certificación sobre la solvencia financiera del Plan, la AAA remitirá al Plan de Salud la aportación correspondiente al mes de junio de 2005.*

  c. De surgir un menoscabo atribuible a las razones expuestas en el inciso 2 y una vez cubierto el mismo, la *AAA reanudará* las aportaciones mensuales.

  d. De concluir la auditoría de la OCS sin señalamiento de menoscabo, la *AAA reanudará* las aportaciones mensuales a partir del 1 de junio de 2005. (Énfasis suplido).

complementario a la estipulación anterior, que recogió los acuerdos producto de la negociación laboral entre la AAA y la Unión.  De ahí que su relación con el Plan sea también laboral.

No hay duda que los acuerdos entre la AAA y la Unión son de índole laboral, pero ello no convierte la relación entre la AAA y el Plan en una de este tipo.  Lo cierto es que el contenido del Documento Aclaratorio y los acuerdos allí plasmados revelan lo contrario.  En lo que a la AAA y al Plan se refiere, el Documento Aclaratorio lo que hace es precisar cuándo, y bajo qué condiciones, la AAA desembolsará los pagos debidos al Plan por los servicios que éste provee a los miembros de la UIA.  La participación del Plan en ese documento fue únicamente a efectos de comprometerse a cumplir ciertas condiciones requeridas por la AAA, para poder recibir las aportaciones en concepto de primas que permiten su funcionamiento como organización de servicios de salud. El contenido del Documento Aclaratorio lleva ineludiblemente a la conclusión que el Plan comparece como un tercero en lo que se refiere a la relación obrero-patronal entre la AAA y la Unión.  Se trata, pues, de un esquema contractual que es en parte laboral, en lo que se refiere a los acuerdos entre la AAA y la Unión, y en parte privado, en cuanto a los acuerdos entre la AAA y el Plan.  Nuestro ordenamiento, que está basado en el principio de la libertad de contratación, no prohíbe esta forma de contratación múltiple, aunque la mejor práctica sería plasmar estas distintas relaciones obligacionales en documentos separados.

Habiendo aclarado de umbral estos puntos medulares, a continuación examinaremos los señalamientos de la AAA y las razones que apoyan nuestro voto disidente a la decisión de la Mayoría del Tribunal.

IV

Veamos primeramente el asunto jurisdiccional. Como indicamos anteriormente, la Junta de Relaciones del Trabajo es el organismo con jurisdicción exclusiva para atender cargos de práctica ilícita, y entre las prácticas ilícitas contenidas en la Ley de Relaciones del Trabajo se encuentra la suspensión por el patrono de los pagos correspondientes a un seguro médico para los empleados durante una huelga o la negociación de un nuevo convenio. Por el texto e intención de la Ley, esta práctica ilícita se refiere, específicamente, a la situación en que un patrono *niegue* a sus empleados la *disponibilidad* del plan médico, mediante la suspensión o la intención de suspender los pagos en concepto de primas.

La AAA no ha negado a sus empleados la disponibilidad de un plan médico. Por el contrario, durante la huelga y el proceso de negociación colectiva, los miembros de la UIA no han estado desprovistos de un seguro médico. El Plan de Salud UIA ha estado brindando sus servicios a los unionados durante todo este proceso; además, el patrono ofrece la oportunidad a sus empleados de acogerse al seguro médico de la Triple S. El asunto traído ante la consideración de este Tribunal no es, pues, el impago de un plan médico a los empleados, sino el incumplimiento de la AAA con una obligación de pago contraída contractualmente con una aseguradora independiente, el Plan de Salud UIA, Inc. La AAA le está

pagando las aportaciones que debe a la Triple S pero no las que debe al Plan de Salud UIA, Inc., a pesar de haberse comprometido a hacerlo mediante contrato. En otras palabras, la controversia no es si el patrono está pagando un plan médico a sus empleados, sino si está justificado en suspender unilateralmente el pago que acordó hacer a un plan en particular por servicios que se están prestando a los suscriptores de dicho plan, esto es, a los empleados de la AAA que optaron por el Plan. No se trata de la suspensión de los servicios de un plan médico provocado por un patrono en el fragor de una negociación con la Unión, sino del incumplimiento de una obligación contractual asumida por una corporación pública con una aseguradora médica.

Contrario a lo que alega la AAA, la Junta de Relaciones del Trabajo no tiene jurisdicción exclusiva en el caso de autos. Según explicamos, la Junta atiende asuntos que involucren los derechos públicos contenidos en su ley orgánica. La acción presentada por el Plan constituye un pleito privado en cobro de dinero. El Plan no intenta vindicar los derechos públicos de los unionados, porque el patrono no le ha negado a los empleados la disponibilidad de un plan médico. La controversia presentada ante los tribunales es si el Plan había cumplido con las obligaciones contraídas, cuyo cumplimiento era, a su vez, condición para activar la obligación de la AAA de pagarle lo que le debía por servicios provistos. El Plan reclama el cobro de una deuda líquida y exigible por los servicios que ha prestado y que se encuentra prestando a los empleados de la AAA. Se trata, por tanto, de un pleito para reclamar los intereses

y derechos privados de una organización de servicios de salud que busca se le compense por los servicios que provee a sus suscriptores.

La prueba contenida en los autos del caso, la cual fue creída tanto por el Tribunal de Primera Instancia como por el Tribunal de Apelaciones, indica que el Plan cumplió con aquello a lo que se obligó ante la AAA en el Documento Aclaratorio. Sólo resta determinar si la AAA está obligada a cumplir con lo allí acordado. Por consiguiente, resolvería que en el caso de autos no está en controversia la comisión de una práctica ilícita, sobre la cual solo la Junta tendría jurisdicción, sino el incumplimiento de la AAA con el pago de una deuda. Así, la acción del Plan corresponde a una reclamación en cobro de dinero motivada por el incumplimiento de la AAA con una obligación de pago voluntariamente asumida.

No se nos ha planteado que la Junta tenga ante sí una querella por práctica ilícita promovida por los unionados acogidos al Plan, y aunque la tuviese, ello no sería impedimento al ejercicio de nuestra jurisdicción para atender los intereses privados insitos en esta controversia.[16] Tampoco estaría facultado el Plan para promover su reclamación ante la Junta. Como parte ajena a la relación laboral, el Plan sólo puede intervenir si la Junta lo autoriza, una vez comenzado un procedimiento de

---

[16] La situación jurisdiccional podría ser distinta si antes de que los tribunales hubieran asumido jurisdicción se hubiera presentado una querella por práctica ilícita o la Junta de Relaciones del Trabajo hubiese actuado sobre el derecho público que se pudiera derivar de la presente controversia. La conclusión que se deriva de esta discusión no impide que en su día la Unión acuda ante la Junta con una querella de práctica ilícita contra su patrono, en representación de los unionados que vean afectado su derecho a un plan médico por la negativa del patrono de hacer los pagos correspondientes.

querella, y entonces, según dispone la Ley de Relaciones del Trabajo, con el único propósito de aportar prueba relacionada a la práctica ilícita alegada, no de reclamar la reivindicación de sus intereses privados. El asunto ante nuestra consideración requiere la participación plena del Plan como parte realmente afectada y con interés sobre lo que se resuelva en su día. Ello no sería posible en un procedimiento ante la Junta. La resolución de esta controversia también requeriría la participación extensa de la OCS, y la posibilidad de ordenarle a esta oficina que asuma un rol fiscalizador sobre el Plan, para lo cual la Junta no tiene facultad. Conforme a esto, la Junta tampoco podría implantar las medidas correctivas emitidas por la OCS. El rol que ha ejercido la OCS a lo largo de este proceso es muestra de cuán importante ha sido su intervención, la cual ha sido ampliada a instancias de este Tribunal.[17]

Las razones que ha formulado la AAA para no cumplir con su obligación no se relacionan a su disputa obrero-patronal con la UIA, sino a un alegado incumplimiento del

---

[17] Desde el 28 de diciembre de 2005, autorizamos la comparecencia de la Oficina de la Comisionada de Seguros solicitó en calidad de *Amicus Curiae*. En su comparecencia especial, la OCS explicó la situación económica del Plan de Salud y los efectos sobre ésta de la negativa de la AAA a pagar las primas adeudadas hasta el momento. Además, la OCS ha estado participando constantemente durante el trámite del caso de autos, ofreciéndonos la información necesaria para atender nuestras inquietudes sobre la situación económica del Plan de Salud y los efectos que tendría la eventual resolución del caso. Entre sus comparecencias se destaca una fechada 10 de julio de 2006, en que la OCS informó, entre otras cosas, que, después de revisar los estados financieros del Plan, le tuvo que notificar a dicha entidad que tendría 90 días, a partir del 9 de agosto del 2006, para cubrir el menoscabo de activos causado por la falta de pago de primas. Indudablemente, esta comunicación destaca la urgencia que tiene la resolución final de este caso.

Plan con las disposiciones estatutarias que regulan el mercado de los seguros. Esto evidentemente está fuera del conocimiento especializado de la Junta. La Junta no tiene facultad sobre las operaciones de un plan médico, ni sobre cómo funciona un sistema basado en primas por servicios de proveedores médicos. Ante lo planteado, se requiere un análisis basado en nuestro Derecho de Seguros para determinar si el Plan está operando adecuadamente y si ha cumplido con la obligación asumida en el Documento Aclaratorio. Somos los tribunales los llamados a resolver esta controversia.

Por otra parte, no debemos propiciar que un patrono tenga la plena libertad de calificar sus propios actos como práctica ilícita, sin que se haya presentado imputación alguna en ese sentido, con el propósito de determinar, a su conveniencia, el foro que tendrá jurisdicción sobre una controversia y evadir de esta forma la jurisdicción del tribunal. Por consiguiente, contrario a la conclusión a la que llega este Tribunal, resolvería que el foro apelativo no erró al concluir que la negativa de la AAA de pagarle al Plan de Salud UIA las aportaciones adeudadas no es materia de la jurisdicción exclusiva de la Junta de Relaciones del Trabajo.

En cuanto a las alegaciones de la AAA de que el tribunal estaba impedido de emitir un *injunction* preliminar en su contra por razón de la Ley núm. 50, tampoco tiene razón. Como vimos, la Ley núm. 50 limita la jurisdicción de los tribunales para emitir *injunctions* en casos que "envuelva[n] o surja[n] de una disputa obrera". En otras palabras, la Ley limita la jurisdicción interdictal de los tribunales solamente cuando se trate de

casos que involucren o provengan de una disputa obrero-patronal. La Ley define "disputa obrera" de manera abarcadora pero siempre dentro del marco de una controversia relativa a términos o condiciones de empleo "y a la asociación o representación de personas al negociar" sobre éstos. Es en ese contexto que aclara que las partes no necesariamente tienen que estar "en la relación inmediata de patrono o empleado". 29 L.P.R.A. sec. 109. La amplitud de esta definición, por tanto, tiene como objetivo la protección de aquellos terceros, sean personas, empleados, asociaciones, organizaciones afiliadas u otras uniones, entre otras, que en ocasiones participan en las actividades concertadas de las uniones en ayuda mutua. De esa forma, la inclusión en el concepto de disputa obrera de terceros que no están en relación propiamente laboral con un patrono se limita a aquellos que participan en el conflicto de forma legítima para asegurar el libre ejercicio del derecho de asociación, de expresión y de negociación colectiva en las actividades concertadas de las uniones interesadas directamente en la disputa.

El Plan de Salud de la UIA no es parte en la relación obrero-patronal entre la UIA y la AAA ni en el Convenio Colectivo acordado por ésta, ya que no es empleado de la AAA ni representa a los miembros de la UIA. Además, como antes indicara, la reclamación del Plan persigue vindicar sus intereses privados. Por tanto, resolvería que la controversia en el caso de autos no es una "disputa obrera" para efectos de la Ley núm. 50. A diferencia de la Mayoría del Tribunal, entiendo que este caso no se refiere a los términos o condiciones de empleo

de trabajadores, ni tampoco es en relación con la organización o representación de éstos o sobre la negociación, fijación, mantenimiento, cambio o esfuerzo para convenir términos o condiciones de empleo. Además, al no clasificar la presente controversia como una disputa obrera, y permitir por tanto la expedición de un *injunction* contra la AAA, no se afectarían los derechos constitucionales y estatutarios de los trabajadores. Por eso, no estamos ante una situación a la cual se puede aplicar la prohibición de la Ley núm. 50.

Por último, solo queda por discutir si el *injunction* dictado se expidió conforme a derecho. De la prueba presentada ante el TPI surge que el Plan probó los requisitos necesarios para la concesión de un *injunction*. Un plan de salud opera a base del dinero que ingresa por concepto de primas mensuales, el cual se va gastando conforme se utilicen los servicios del plan por los suscriptores. En su comparecencia, la OCS explicó que si la AAA no paga las primas adeudadas y no continúa con los pagos sucesivos de las mismas, se produciría un menoscabo de activos en el Plan. A su vez, esto causaría un problema serio de flujo de efectivo que impediría que el Plan cumpla con los pagos a los proveedores de servicios. Esta situación provocaría el colapso económico del Plan ante su incapacidad de cumplir con sus compromisos contractuales, y traerá como consecuencia inmediata el que la OCS liquide al Plan e impida su funcionamiento como organización de servicios de salud. Además, los proveedores de servicios del Plan le han notificado su intención de dejar de atender a los asegurados si no reciben el pago inmediato de lo que se les adeuda. Esto, sin duda alguna, demuestra

la naturaleza e irreparabilidad del daño que puede causársele al Plan si no se pagan inmediatamente las aportaciones que le corresponden. Debido a la urgencia del Plan de recibir activos y la amenaza cercana de su posible liquidación, el tramitar esta reclamación por la vía ordinaria contra la AAA tornaría en académica la controversia. Por consiguiente, no hay un remedio adecuado en la vía ordinaria que evite que la controversia se torne académica y los posibles daños de mayor consideración a la actual situación económica del Plan.

A la luz del derecho aplicable, el Plan tiene probabilidad de prevalecer en la resolución final de este caso. La deuda de la AAA es líquida y de fácil determinación, además de que la obligación consta claramente en un documento firmado por las partes. La AAA estaba obligada a pagar estas primas al Plan, ya que por medio del contrato y sus acciones permitió que sus empleados eligieran libremente entre dos planes médicos. Sin embargo, continuó pagando las primas a uno y se abstuvo de enviarle los pagos correspondientes al otro. Esto es un patente incumplimiento de su parte. La propia AAA reconoce la deuda y su actuación intencional de retener los pagos correspondientes. Por último, el no permitir el *injunction* tendría un impacto considerable sobre el interés público, ya que expondría a miles de asegurados y sus familias a quedarse sin plan médico, además de permitir que deudas millonarias con proveedores de salud queden incumplidas.

Por todo lo anterior, entiendo que tanto el foro primario como el apelativo actuaron correctamente en este caso y disiento del dictamen emitido el día de hoy.

Liana Fiol Matta
Jueza Asociada